No. 100,477

NEIL EDGAR, SR., *Appellant*, v. STATE OF KANSAS, *Appellee*.

(283 P.3d 152)

Opinion filed July 27, 2012.

*Michael J. Bartee*, of Michael J. Bartee, P.A., of Olathe, argued the cause and was on the brief for appellant.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Stephen M. Howe*, district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the United States Supreme Court established a two-prong test for determining if a criminal defendant's right to effective assistance of counsel under the Sixth Amendment to the United States Constitution has been violated by the deficient performance of counsel. Under this test, a defendant must demonstrate that (1) counsel's performance was deficient and (2) counsel's deficient performance was sufficiently serious to prejudice the defense and deprive the defendant of a fair trial. To establish the second prong, the defendant must establish a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different. This court recognized this standard in *Chamberlain v. State*, 236 Kan. 650, 657-58, 694 P.2d 468 (1985). Applying this *Strickland/Chamberlain* test in the present case, the district judge concluded Neil Edgar, Sr., failed to satisfy either prong of the test. On appeal from that ruling, the Court of Appeals reversed the district court's summary denial of Edgar's K.S.A. 60-1507 motion and remanded for a hearing on the first prong, but it failed to address the second prong. *Edgar v. State*, No. 100,477, 2009 WL 5206231 (Kan. App. 2009) (unpublished opinion) (*Edgar II*). Subsequently, the State sought this court's review of that decision, arguing the Court of Appeals erred in remanding the case for a hearing rather than holding that Edgar

·failed to satisfy the second prong of the *Strickland/Chamberlain* test.

We accepted the State's cross-petition for review and now reverse the Court of Appeals' decision on this issue. In *Strickland*, the United States Supreme Court held that a court does not have to determine whether counsel's performance was deficient before examining the prejudice that resulted from the alleged deficiencies and, in fact, should resolve the issue on the second prong, if possible, rather than insist on a first-prong determination. Consequently, the Court of Appeals could and should have reviewed the district judge's ruling on the second prong of the *Strickland/Chamberlain* test. Conducting our own review, we conclude the district judge correctly concluded that Edgar had failed to establish prejudice.

## FACTS AND PROCEDURAL BACKGROUND

Edgar's claims of ineffective assistance of counsel relate to a criminal case that was filed following the death of Edgar's 9-year-old son Brian. In that criminal case, Edgar was charged in count I with felony murder, in violation of K.S.A. 21-3401(b), occurring during the commission of abuse of a child by inflicting cruel and inhuman corporal punishment upon Brian on December 30, 2002. Edgar was also charged in counts II and III with child abuse, in violation of K.S.A. 21-3609, involving two of Edgar's other children: 12-year-old Martez and 9-year-old Christina. The allegations were that the abuse of Martez and Christina occurred during the time period from May 9, 2002, to December 30, 2002.

Edgar's wife, Christy Edgar (Christy), and Chasity Boyd (Boyd), described by the Edgars as their "granddaughter" and by the Edgar children as their "babysitter," were also charged with the same crimes. Edgar, Christy, and Boyd were tried jointly. After opening statements in the trial, Christy pleaded guilty to all of the charges. Edgar and Boyd agreed the jury could be told of her plea, and Edgar defended against his charges by arguing Christy was the one who committed the abuse, he did not aid and abet in any of her acts of abuse, and he had no knowledge of the incident that led to Brian's death.

Rejecting this defense, a jury convicted Edgar of the felony murder of Brian and of the child abuse of Martez and Christina. The district judge then sentenced Edgar to a term of life imprisonment for the felony-murder conviction and to 32 months' imprisonment on each of the child abuse convictions, with the sentences for the child abuse convictions to run concurrent with each other and consecutive to the sentence for felony murder.

On direct appeal, this court affirmed Edgar's convictions and sentences in *State v. Edgar*, 281 Kan. 47, 127 P.3d 1016 (2006) (*Edgar I*). An extensive discussion of the facts can be found in that decision, but a summary is necessary because our review requires a discussion of the prejudice prong of the *Strickland/Chamberlain* test, a discussion that is necessarily factual.

As to the evidence regarding the felony-murder offense charged in count I, an autopsy revealed Brian died of asphyxiation when he aspirated his own vomit. At the time of his death, Brian was wrapped "like a mummy" in duct tape with only his nose left open for breathing. A sock had been stuffed in Brian's mouth and taped down to keep him from "hollering" and gnawing on the tape.

There was evidence that Edgar was the one who restrained Brian on the night of his death. In fact, Edgar initially confessed to police that he "did it." He told the police he had restrained Brian by wrapping his arms, torso, and ankles with belts and that he had used duct tape to cover a sock he stuffed in Brian's mouth so that Brian could not "holler." In addition, Martez told detectives Edgar tied up Brian on the night of Brian's death. Martez also stated that Edgar was the one who usually punished the boys.

Most of the evidence at trial, however, indicated Christy and Boyd had taped Brian on the night of his death and were the ones who most often punished the children. Some evidence suggested that Christy would tell Boyd to punish the children and that Boyd would be the one who physically restrained the children. Consistent with this evidence, the State argued to the jury that Edgar aided and abetted Christy and Boyd in the acts of child abuse. In fact, during closing argument, the prosecutor said, "Sure, Chasity Boyd does most of the tying but this guy is up to his ears in this."

Later, the prosecutor said, "Did he aid and abet? Yes. We know that in a thousand different ways."

The evidence of aiding and abetting came from the testimony of Brian's siblings—Martez, Christina, and 16-year-old Christon. For example, Martez specifically told detectives that Martez and Brian were punished on the night of Brian's death because they had angered Edgar. Martez also told the detectives he was thankful he had good parents who simply bound him up instead of cutting off his hands, as in biblical times, when he stole something. He told detectives that his father told them, "What happens in this house stays in this house." Similarly, Christina testified that she and the boys were in trouble on the night of Brian's death. More generally, during a taped interview that was shown to the jury, Christina stated, "My dad, he tied me up. My mommy did, Chasity tied me."

Christon provided direct evidence of Edgar's aiding and abetting. In Christon's testimony, he explained that Brian had been taped 2 nights in a row because he had "stolen" food by eating without permission or, on the day of his death, by taking cookies while the family was at the church where Edgar was the pastor and Christy was the prophet. On the first night, Brian was wrapped in duct tape from his ankles to his shoulders. The next night, Christy and Boyd began taping Brian in a similar manner but ran out of duct tape before they got above his waist. Edgar had not been present when the taping started but came in as Christy was leaving to go to a store for more duct tape. According to Christon, Edgar saw Brian taped to the waist and, upon learning Christy was going to the store, offered to drive her. When Edgar and Christy returned from the store with duct tape, the women taped Brian so that the duct tape went above his shoulders, covering all of his face except his nostrils. Christon explained that Brian, who was so adept at escaping from his restraints that he was known in the family as "Houdini," had attempted to gnaw through the tape on the previous night. Apparently, the women did not want this to happen again; as they finished the taping, one of the women said, "Now try to get out of this one." Christon testified that Edgar did not actually do the taping and had not seen Brian with his face taped.

Edgar testified, denying any knowledge of Christy's decision to tape Brian's face. Further, Edgar denied knowing the reason for Christy's trip to the store, insisting he was merely an uninformed driver. Nevertheless, there was circumstantial evidence that Edgar intentionally promoted and assisted in the crime—the punishment resulted because Brian had angered and defied Edgar and Edgar had walked in during the taping, suggesting he would have known Christy was going to the store to get more duct tape.

Regarding the alleged child abuse against Martez and Christina over a several-month period, both children made statements to police and testified at trial regarding repeated abuse. Martez testified that although Edgar usually punished the boys, Boyd had wrapped him with plastic ties on the night of Brian's death. Martez described in great detail the plastic ties that were used to bind him and explained to the police that he figured out how to get out of them with a bobby pin. Christon testified that when he awoke on the morning before Brian's death, he found Martez in bed restrained by plastic ties. Similarly, Christina reported multiple occasions of being bound or tied up with socks, duct tape, or plastic ties and having had a stocking or tape put over her mouth. On the night Brian died, Christina was tied up and made to sleep on the floor in the basement. Christina testified that Boyd usually tied her up but did so at the direction of Christy.

Expert testimony was presented establishing that both Martez and Christina had scars on their wrists consistent with having an injury caused by the use of a ligature to tie or bind them and that some scars were older than others. Finally, a fellow church member of the Edgars testified that Christy had told her about a new way of disciplining the children by tying them up. The church member testified that she had seen Brian, Martez, and Christina tied by their hands and feet with plastic ties.

In *Edgar I*, based on this and the other evidence discussed in that decision, we rejected Edgar's argument that the evidence was insufficient to support his conviction for the felony murder of Brian. This court concluded: "[T]here was overwhelming evidence of child abuse in this case and of Edgar's involvement." *Edgar I*, 281 Kan. at 69. In addition, we noted that Edgar did not contest

the sufficiency of the evidence in support of his convictions for the child abuse of Martez and Christina. *Edgar I*, 281 Kan. at 68-69.

Approximately 1 year after this court affirmed Edgar's convictions, Edgar filed a K.S.A. 60-1507 motion, raising five main issues and multiple sub-issues. Of these multiple issues, only one is subject to our review: a claim of ineffective assistance of defense counsel during closing argument. Specifically, in presenting that issue in his motion, Edgar asserted his defense counsel was "ineffective for conceding movant's guilt to the jury during closing argument. When counsel told them that he wasn't worried about the abuse of a child charges and that they could go ahead and find him guilty on those he made their conviction for felony murder mandatory under the law."

Edgar's complaint focused on the following portion of defense counsel's closing argument:

"Neil Edgar is not guilty of Count No. 1. And I really don't care about Counts II and III.

"Something went on. And if you want to find my client guilty of Counts II and III, go right ahead. I'm not going to argue that. . . .

. . . .

". . . Your job is to say to Mr. [Prosecutor], hell of a job, but you know what, you've already got the lady that did it. We don't need to compound the tragedy. We don't need to foist upon him a murder and first-degree conviction, the other two counts are enough. We're going to do what is right and what is right is not guilty on murder in the first-degree."

Edgar's claim that the statements in closing argument were the result of unreasonable performance by defense counsel was summarily rejected by the district judge who had presided over Edgar's trial. In doing so, the judge stated the two-prong *Strickland/Chamberlain* test and noted: "There is a strong presumption of effective assistance of counsel. The burden is on the defendant to present sufficient facts that suggest otherwise justifying a hearing on the motion." As to the first prong of the *Strickland/Chamberlain* test—requiring the defendant to show that counsel's performance fell below an objective standard of reasonableness under the circumstances and as judged at the time of counsel's conduct—the judge stated, "In [*Edgar I*], the Kansas Supreme Court specifically

quoted defense counsel's remarks concerning counts II and III and noted that this was a trial strategy." Next, addressing the second prong of the *Strickland/Chamberlain* test—a defendant must prove that there is a reasonable probability that, but for counsel's errors, the outcome of the decision would have been different— the judge stated, "Given the overwhelming evidence in this case and the nature of the crimes, the Court cannot conclude that trial counsel was ineffective for making these statements or concessions or that a different approach would have changed the outcome as required by *Chamberlain*. [Movant's] claim is without merit."

Edgar appealed. In his brief on appeal, Edgar argued, in part:

"If the [movant] had nothing to do with the discipline of the children, then it was nonsensical for counsel to argue that he should be found guilty of the two counts that did not result in death, but not guilty of the count that resulted in death. Counsel's conduct appears to have been deficient, and, but for that deficient conduct, a not guilty verdict may have resulted."

Without much discussion, the Court of Appeals stated that due to the district judge's summary denial of Edgar's motion, there was no evidence from which the panel could determine whether defense counsel's statements constituted a concession of guilt and, if so, whether this was an objectively reasonable trial strategy. *Edgar II*, 2009 WL 5206231, at *3. But, as previously noted, the panel did not discuss the second prong of the ineffective assistance of counsel test, that is, whether the district judge erred in determining that Edgar failed to establish that there is a reasonable probability that, but for counsel's errors, the outcome of the decision would have been different. Instead, the panel reversed the district judge's summary denial of this issue and remanded for "an evidentiary hearing to determine whether trial counsel's comment was a concession of guilt during [trial] and, if so, whether it was an objectively reasonable trial strategy. [Citation omitted.]" *Edgar II*, 2009 WL 5206231, at *3. The panel affirmed the district judge's decision on all other issues. *Edgar II*, 2009 WL 5206231, at *4-6.

Edgar filed a petition for review, challenging the Court of Appeals' rulings on the issues it affirmed. The State filed a cross-petition for review, arguing the Court of Appeals erred in not considering the prejudice prong of the ineffective assistance of counsel

test prior to reversing the district judge's denial of Edgar's K.S.A. 60-1507 motion. This court denied Edgar's petition for review but granted the State's cross-petition. This court has jurisdiction under K.S.A. 20-3018(b) and K.S.A. 22-3602(e).

To analyze the State's argument that the Court of Appeals erred when it did not consider the prejudice prong of the *Strickland/ Chamberlain* test, it is necessary to examine the standards that apply to (1) consideration of Edgar's K.S.A. 60-1507 motion and (2) the specific issue of ineffective assistance of counsel. Those standards can then be applied to the specific circumstances of this appeal.

### DISTRICT COURT AND APPELLATE STANDARDS FOR A K.S.A. 60-1507 MOTION

Generally, when presented with a K.S.A. 60-1507 motion, a district judge has three procedural options for handling the motion. One option is to summarily deny the motion without appointing counsel or conducting an evidentiary hearing. A summary denial is appropriate only if the motion, files, and records of the case conclusively show that the movant is not entitled to relief. *Trotter v. State*, 288 Kan. 112, 132, 200 P.3d 1236 (2009); *Bellamy v. State*, 285 Kan. 346, 353, 172 P.3d 10 (2007). To avoid summary denial of the motion, " '[a] movant has the burden to prove his or her K.S.A. 60-1507 motion warrants an evidentiary hearing; the movant must make more than conclusory contentions and must state an evidentiary basis in support of the claims or an evidentiary basis must appear in the record.' " *Trotter*, 288 Kan. at 131-32 (quoting *Swenson v. State*, 284 Kan. 931, 938, 169 P.3d 298 [2007]). In this case, the district judge found Edgar failed to meet this burden and, without appointing counsel or conducting a hearing, concluded Edgar was not entitled to relief or, in other words, summarily denied the motion.

When a district judge summarily denies a K.S.A. 60-1507 motion, an appellate court reviews that decision using a de novo standard of review. *Holt v. State*, 290 Kan. 491, 495, 232 P.3d 848 (2010) (citing *State v. Howard*, 287 Kan. 686, 690-91, 198 P.3d 146 [2008]). This standard requires an appellate court to determine

whether the motion, files, and records of the case conclusively show the movant is not entitled to any relief. *Wimbley v. State*, 292 Kan. 796, 804-05, 275 P.3d 35 (2011).

Edgar must meet this standard in the context of establishing that he was denied his right to effective assistance of counsel because of defense counsel's remarks during closing argument.

## INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

The right to effective assistance of counsel arises from the Sixth Amendment to the United States Constitution, which guarantees in "all criminal prosecutions" that "the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." See *Chamberlain*, 236 Kan. at 656-57 (adopting the standards established in *Strickland*, 466 U.S. at 687); see also *State v. Gonzales*, 289 Kan. 351, 357-58, 212 P.3d 215 (2009); *Bledsoe v. State*, 283 Kan. 81, 90, 150 P.3d 868 (2007).

To support a claim of ineffective assistance of counsel based on counsel's performance, a defendant must demonstrate that (1) counsel's performance was deficient and (2) counsel's deficient performance was sufficiently serious to prejudice the defense and deprive the defendant of a fair trial. *Strickland*, 466 U.S. at 687; *Chamberlain*, 236 Kan. at 656-57; see, *e.g.*, *Holmes v. State*, 292 Kan. 271, 274-75, 252 P.3d 573 (2011); *State v. Davis*, 277 Kan. 309, 314-15, 85 P.3d 1164 (2004); *State v. Orr*, 262 Kan. 312, 317, 940 P.2d 42 (1997); *State v. Rice*, 261 Kan. 567, 598-603, 932 P.2d 981 (1997); see also *State v. Gleason*, 277 Kan. 624, 643, 88 P.3d 218 (2004) (discussing difference between *Strickland* test that applies to deficient performance of counsel and claims of ineffective assistance of counsel based upon conflict of interest that are analyzed somewhat differently under *Mickens v. Taylor*, 535 U.S. 162, 166, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002). Thus, the " 'benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. [Citations omitted.]' " *Gonzales*, 289 Kan. at 357 (quoting *Bledsoe*, 283 Kan. at 90).

In *Bledsoe*, this court explained in detail the two steps in the ineffective assistance of counsel analysis, stating:

"The first prong of the test for ineffective assistance of counsel requires a defendant to show that counsel's representation fell below an objective standard of reasonableness, considering all the circumstances. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. We must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. [Citation omitted.]

"[Under the second prong of the test for ineffective assistance of counsel], the defendant also must establish prejudice by showing that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. [Citation omitted.]" *Bledsoe*, 283 Kan. at 90-91.

See *Cullen v. Pinholster*, 563 U.S. 170, 189, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011); see also *Brecht v. Abrahamson*, 507 U.S. 619, 637-38, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) (less onerous nonconstitutional error standard applies in determining whether collateral relief must be granted because of constitutional error rather than the *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 [1967], harmless-beyond-a-reasonable-doubt standard).

In recognizing the presumption that counsel's conduct is reasonable, the *Bledsoe* court noted the distinction between decisions that are to be made by a criminal defendant and the areas of trial strategy that are left to the professional judgment of defense counsel, stating:

"[C]ertain decisions relating to the conduct of a criminal case are ultimately for the accused: (1) what plea to enter; (2) whether to waive a jury trial; and (3) whether to testify. Others are ultimately for defense counsel. The decisions on what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his or her client. [Citation omitted.]" *Bledsoe*, 283 Kan. at 92.

See *Moncla v. State*, 285 Kan. 826, 837-38, 176 P.3d 954 (2008) (courts will defer to counsel on matters of trial strategy).

Despite this recognition that most trial decisions are left to defense counsel's professional judgment regarding strategy, " '[m]ere invocation of the word "strategy" does not insulate the performance of a criminal defendant's lawyer from constitutional criticism,' especially ' "when counsel lacks the information to make an informed decision due to inadequacies of his or her investigation." ' " *Gonzales*, 289 Kan. at 358 (quoting *Wilkins v. State*, 286 Kan. 971, 982, 190 P.3d 957 [2008]). In addition, "[a]n attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy." *Florida v. Nixon*, 543 U.S. 175, 187, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004) (quoting *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 [1984]).

Edgar's allegations place this last qualification into issue; he suggests defense counsel's closing argument was contrary to agreed-upon defense strategy. Hence, in this case, the first prong of the *Strickland/Chamberlain* test could not be determined based merely on a conclusion that defense counsel's closing argument was "trial strategy." Rather, as the Court of Appeals concluded, factual questions exist that cannot be determined without an evidentiary hearing.

Nevertheless, as the State argues, a hearing is not necessary if a defendant fails to satisfy the second prong of the *Strickland/Chamberlain* test. It is the rare case where a defendant does not have to meet the second prong of proving that, but for counsel's deficient performance, the result of the proceeding would have been different. The United States Supreme Court has explained that a "narrow exception" to the requirement applies "infrequently [when] the 'surrounding circumstances [will] justify a presumption of ineffectiveness.' " *Nixon*, 543 U.S. at 190 (quoting *United States v. Cronic*, 466 U.S. 648, 662, 104 S. Ct. 2039, 80 L. Ed. 2d 657 [1984]); see *State v. Carter*, 270 Kan. 426, 440-41, 14 P.3d 1138 (2000) (presuming prejudice where defense counsel ignored defendant's repeated objection to counsel's strategy of admitting guilt and counsel's conduct deliberately overrode defendant's plea of not

guilty). This narrow exception, referred to as the *Cronic* exception, is "reserved for situations in which counsel has entirely failed to function as the client's advocate." *Nixon*, 543 U.S. at 189. The Supreme Court has stressed this last point, emphasizing "the attorney's failure must be complete," that is, the *Cronic*-type presumption applies only " 'if counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing.' [Citation omitted.]" *Bell v. Cone*, 535 U.S. 685, 697, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002).

In this case, Edgar does not argue for the application of this narrow exception, and the district judge did not apply it. Nor did the Court of Appeals cite to the exception or any case applying it. Instead, although not citing to *Chamberlain* or *Strickland*, the Court of Appeals reiterated the two-prong test set out in those decisions before discussing Edgar's various complaints of ineffective assistance of counsel. *Edgar v. State*, No. 100,477, 2009 WL 5206231, at *1 (Kan. App. 2009) (unpublished opinion) (*Edgar II*) (citing *Harris v. State*, 288 Kan. 414, 416, 204 P.3d 557 [2009]). Then, in discussing the issue before us, the Court of Appeals cited three cases: *United States v. Pledger*, 887 F. Supp. 1400, 1406-07 (D. Kan. 1995); *Bledsoe*, 283 Kan. at 93-95; and *LaPointe v. State*, 42 Kan. App. 2d 522, 555, 214 P.3d 684 (2009). *Edgar II*, 2009 WL 5206231, at *3, *6. Each of those cases used the two-part *Strickland* test.

Of the three decisions, *Pledger* is the most factually similar to the present case. In that case, defense counsel conceded guilt on one count but asserted innocence on other counts. In doing so, according to the *Pledger* court, defense counsel exercised "professional judgment [and] made a tactical decision to concede defendant's guilt on count 2, in the face of the overwhelming evidence presented by the government at trial, in order to establish credibility with the jury concerning defendant's arguments regarding the other counts of the indictment." *Pledger*, 887 F. Supp. at 1406. The *Pledger* court specifically cited *Strickland* and applied its two prong test; the court gave no indication that *Cronic* applied. *Pledger*, 887 F. Supp. at 1406-07.

Neither did the Court of Appeals in this case. Further, Edgar did not discuss or request application of the *Cronic* exception. Nevertheless, the dissent in this case suggests we should apply the exception because *Carter*, 270 Kan. 426, which applied *Cronic*, controls. We decline to do so for two reasons. First, it can be argued that *Carter* is distinguishable and, second, there is uncertainty regarding whether *Carter*'s rationale and perhaps its holding remain valid in light of two United States Supreme Court decisions filed after *Carter*.

Regarding the first point, other courts have found *Carter* distinguishable from cases such as Edgar's. Specifically, among other factors, these courts distinguish between (1) a situation where counsel concedes guilt on alternative charges, all charges, or the only charge from (2) a situation where counsel concedes guilt on a lesser charge in an effort to gain credibility and win acquittal on the more severe charge. See, *e.g.*, *State v. Gordon*, 262 Wis. 2d 380, 394-96 & n.6, 663 N.W.2d 765 (2003) (cataloguing decisions, including *Carter* and *Pledger*). *Pledger*, the decision relied on by the Court of Appeals in the present case, is an example of a case in the second category. The present case is more like *Pledger* than *Carter*.

In *Carter*, Jerome Carter was convicted of first-degree murder, aggravated robbery, and criminal possession of a firearm. The first-degree murder count had been charged in the alternative of either premeditated murder or felony murder. At trial, defense counsel's strategy was to concede Carter's involvement in the shooting of the victim and the robbery but deny any premeditation, thus directing the jury toward a felony-murder conviction rather than the alternative premeditated first-degree murder conviction charged in the same count. In contrast, in this case Edgar's counsel asserted Edgar's innocence as to the murder charge; defense counsel argued Edgar had no knowledge and no involvement in the acts that led to Brian's death. The arguments of counsel that Edgar challenges related to *separate* charges in which Martez and Christina were the victims. Counsel's arguments were not a complete concession of guilt as to all counts, and in particular as to count I, even if we interpret them as a concession of guilt on counts II and III. Ar-

guably, the situations are distinguishable because the concessions involve separate counts.

The other reason *Carter*'s application is called into question is the uncertainty regarding the potential impact of two decisions of the United States Supreme Court on *Carter*'s rationale. In the 2002 decision of *Bell*, 535 U.S. 685, the Court clarified that an "attorney's failure must be complete" in order for *Cronic*'s presumption of ineffectiveness to apply. *Bell*, 535 U.S. at 697. Then, in the 2004 decision of *Nixon*, 543 U.S. 175, the Court held the *Strickland* test and not the *Cronic* test applied even though defense counsel had conceded guilt during the penalty phase of a capital murder trial, a concession the Florida Supreme Court had labeled a " 'functional equivalent of a guilty plea' " that made counsel's performance presumptively inadequate. *Nixon*, 543 U.S. at 185. In rejecting the Florida Supreme Court's holding, the *Nixon* Court determined counsel's concession of Nixon's guilt did not rank as a " 'fail[ure] to function in any meaningful sense as the Government's adversary.' " *Nixon*, 543 U.S. at 190 (quoting *Cronic*, 466 U.S. at 666). The Court stated that Nixon retained the rights accorded a defendant in a criminal trial despite defense counsel's concessions to the jury because the State was required during the guilt phase to present evidence establishing the essential elements of the charged crimes, the defense maintained the right to cross-examine witnesses, and the concession of guilt did not hinder Nixon's right to appeal. *Nixon*, 543 U.S. at 188.

The Court was, however, careful to limit its holding to capital cases and noted that "such a concession in a run-of-the-mine trial might present a closer question, [as] the gravity of the potential sentence in a capital trial and the proceeding's two-phase structure vitally affect counsel's strategic calculus." *Nixon*, 543 U.S. at 190-91. Thus, *Nixon* is not controlling, but several courts have applied is rationale in noncapital trials. See, *e.g.*, *United States v. Thomas*, 417 F.3d 1053, 1057-59 (9th Cir. 2005), *cert. denied* 546 U.S. 1121 (2006) (applying *Nixon* and holding *Strickland*, not *Cronic*, controlled even though counsel conceded guilt to one of two robbery counts because concession did not abandon all meaningful adversarial testing of the prosecution's case); *Com. v. Cousin*, 585 Pa.

287, 301-08, 888 A.2d 710 (2005) (although defense counsel conceded guilt to criminal homicide, counsel argued against more severe murder charge; there was not a complete failure to subject the prosecution's case to adversarial testing as required by *Nixon*). These decisions and their application of *Nixon* and *Bell* raise questions about the continued viability of the rationale in *Carter*.

Ultimately, when faced with arguments urging us to follow *Carter* we may reaffirm its holding, we may modify it, or we may distinguish it. But this is not the case to make any such decision because no one has asked us to apply *Carter*, much less cited to it or *Cronic*. Consequently, we will review the Court of Appeals' decision on the basis on which it was decided—the two-part *Strickland* test. Given that, we next discuss the Court of Appeals' failure to discuss the second prong—the prejudice prong—of the *Strickland* test.

In *Strickland*, the Supreme Court emphasized the importance of the prejudice prong of its ineffective assistance of counsel test by providing that a claim of ineffective assistance of counsel could be disposed of solely on that ground if the defendant failed to establish that he or she suffered prejudice.

"Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." *Strickland*, 466 U.S. at 697.

Hence, in applying *Strickland/Chamberlain*, before remanding the case for an evidentiary hearing on the first prong of the test, the Court of Appeals could have and should have assumed defense counsel's performance was deficient and then examined whether the district judge erred in concluding that "[g]iven the overwhelming evidence in this case and the nature of the crimes, the Court

cannot conclude that trial counsel was ineffective for making these statements or concessions or that a different approach would have changed the outcome as required by *Chamberlain*."

Had the Court of Appeals conducted that review, it would have undertaken a de novo review to determine if the motion, files, and records of the case conclusively showed that Edgar failed to establish a reasonable probability that, but for defense counsel's errors, the outcome of his trial would have been different. This court applies the same standard of review.

### THERE IS NOT A REASONABLE PROBABILITY OF A DIFFERENT OUTCOME

Thus, the ultimate issue in this appeal is: Has Edgar established a reasonable probability that the jury would have returned a "not guilty" verdict on count I, felony murder, if defense counsel had not made the concessions or proposed the compromise regarding counts II and III? We limit this question to the felony-murder count because that is the way Edgar poses the issue. And in posing the issue he makes only a very limited argument, stating:

"All the charges involved the same type of conduct, i.e. use of physical restraint as [a] form of discipline. The defendant testified that he did not tie or restrain the children—that the women of the church, namely his wife and the other codefendant, were the disciplinarians. . . .

. . . .

"Because the conduct underlying the felony murder charge and the abuse of a child was the same, counsel's argument that the jury should find the [movant] guilty of the abuse of a child charges directly undermined his claim that the [movant] was not guilty of the felony murder for similar conduct. Counsel's argument contradicted his own defense in the case. If the [movant] had nothing to do with the discipline of the children, then it was nonsensical for counsel to argue that he should be found guilty of the two counts that did not result in death, but not guilty of the count that resulted in death. Counsel's conduct appears to have been deficient, and, but for that deficient conduct, a not guilty verdict may have resulted."

These arguments fail to even attempt to satisfy Edgar's burden of persuasion, ignore the nature of the State's aiding and abetting case, and remove defense counsel's statements from the context of closing argument.

Regarding Edgar's burden, Edgar argues simply that "but for [defense counsel's] deficient conduct, a not guilty verdict *may* have resulted." (Emphasis added.) This argument does not acknowledge Edgar's burden to establish a reasonable probability that a "not guilty" verdict would have resulted. Furthermore, Edgar presents no factual argument to rebut the district judge's conclusion that the evidence was overwhelming or its conclusion that a different approach would not have changed the outcome. Indeed, the conclusory nature of Edgar's arguments is reason enough to reject his motion. See *Trotter*, 288 Kan. 112, Syl. ¶ 12; *Swenson*, 284 Kan. at 938.

In addition, a review of the record provides additional reasons to conclude the district judge did not err in ruling that Edgar failed to meet his burden. The record reveals that while there was evidence that Edgar tied and restrained Martez and Brian on occasion, the State's closing argument focused on Edgar's aiding and abetting the women in their role as disciplinarians. As we noted, the prosecutor even stated, "Sure, Chasity Boyd does most of the tying but this guy is up to his ears in this." Then, in presenting the closing argument for Edgar, defense counsel built on this theme. Edgar's counsel, echoed by Boyd's counsel, vilified Christy as the leader, the manipulator, the one who "brain washed" the others, and the one whose "reign of terror" ended the night Brian died.

Edgar's counsel also attempted to distance Edgar from the type of abuse that led to Brian's death. Witnesses were questioned about the one-of-a-kind nature of taping Brian "like a mummy" above the shoulders. Christon was asked whether his father saw how Brian was taped the night of Brian's death—he did not, according to Christon—and about whether his father was nearby when the women taped Brian's upper body—he was not. During closing argument, defense counsel repeatedly emphasized Edgar's lack of participation in or knowledge of the type of abuse that occurred that night. "Find one scintilla of evidence that my client intended that poor child's head to be wrapped with duct tape," defense counsel argued.

In other words, defense counsel's concessions or proposed compromises regarding counts II and III did not contradict the defense

theory that Edgar did not actively participate in the discipline of the children. Further, it continued the theme of the defense that the discipline of Brian was of a different character than previous discipline or the type of discipline applied to Martez and Christina on the night of Brian's death and that Edgar had not done anything to aid and abet that type of punishment, on that night or ever.

A reasonable jury could have found Edgar guilty of aiding and abetting abuse by restraint of the children's hands or feet—the type of abuse aimed at Martez and Christina—but still could have found Edgar not guilty of aiding and abetting the child abuse—the gagging—that led to Brian's asphyxiation. Moreover, Martez and Christina stated that although Edgar had tied them up in the past, he did not do so on the night of Brian's death. Defense counsel's argument preserved the defense that Edgar did not intentionally aid or abet Christy on the night of Brian's death.

Finally, as this court held in *Edgar I* and the district judge who presided over Edgar's trial held in summarily denying Edgar's K.S.A. 60-1507 motion, the evidence against Edgar was overwhelming, particularly in light of Martez' and Christina's testimony that the children were being punished because they had angered Edgar and in light of Christon's testimony that Edgar saw Brian wrapped in duct tape to his waist, Edgar then drove Christy to the store, and Christy returned from the store with duct tape that was used to complete the taping of Brian like a mummy. In light of the nature of closing arguments, the nature of the defense, and the overwhelming evidence against Edgar, our de novo review of the motion, files, and records of the case lead us to conclude Edgar failed to establish a reasonable probability that, but for defense counsel's errors, he would have been found not guilty of felony murder.

As such, the district judge did not err in summarily denying Edgar's requested relief on this claim in his K.S.A. 60-1507 motion.

The decision of the Court of Appeals reversing the district judge's summary denial of Edgar's K.S.A. 60-1507 motion and remanding for an evidentiary hearing is reversed on the issue subject to our order of review. The district judge's denial of Edgar's K.S.A. 60-1507 motion is affirmed.

* * *

JOHNSON, J., dissenting: I respectfully dissent because I believe and embrace what my predecessor, Justice Allegrucci, said in *State v. Carter*, 270 Kan. 426, 441, 14 P.3d 1138 (2000):

"The decision to enter a plea of guilty or not guilty to a criminal charge lies solely with the defendant. It is a fundamental constitutional right guaranteed to a defendant, and defense counsel's imposing a guilt-based defense against Carter's wishes violated his Sixth Amendment right to counsel and denied him a fair trial. Carter's plea of not guilty required the State to prove guilt beyond a reasonable doubt. Defense counsel's conduct relieved the State of that burden. Defense counsel abandoned his client, and the result was a breakdown in our adversarial system of justice. As in [*United States v.*] *Swanson*, [943 F.2d 1070, 1073-74 (9th Cir. 1991),] such a breakdown compels application of the *Cronic* exception. [See *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984).] The conduct of defense counsel was inherently prejudicial and no separate showing of prejudice was required. As this court recently stated: 'The assistance of counsel is among those constitutional rights so basic to a fair trial that their denial can never be treated as harmless error. *State v. Jenkins*, 257 Kan. 1074, Syl. ¶ 2, 898 P.2d 1121 (1995). We have no other alternative except to grant Carter a new trial."

*Carter* explicitly rejected the notion that defense counsel can unilaterally change the client's plea from not guilty to guilty under the guise of trial strategy. 270 Kan. at 440 ("Viewing defense counsel's conduct as part of a trial strategy or tactic is to ignore the obvious. By such conduct defense counsel was betraying the defendant by deliberately overriding his plea of not guilty."). To the contrary, an attorney who imposes a guilt-based defense on an objecting defendant violates such fundamental rights that it is prejudicial per se and no showing of a different outcome of the trial is required. 270 Kan. 426, Syl. ¶ 4.

As an aside, I perceive that the difference between the majority decision and *Carter* may be a matter of perspective. The majority appears to be looking at whether, based on its assessment of the evidence, the jury was correct in convicting the defendant; *Carter* appears to focus on whether the process employed to obtain the conviction was fundamentally fair. I believe that if our constitutions are to mean anything, they must guarantee a fair *process* for all citizens, without regard to the magnitude of available incupatory

evidence. See *State v. Tosh*, 278 Kan. 83, 97, 91 P.3d 1204 (2004) ("Denial of a fair trial violates the due process rights of the guilty defendant just as surely as those of the innocent one.").

Procedurally, the majority wants to simply ignore *Carter*. Part of its rationale is that it thinks this court might want to do something different in the future based upon what some "other courts" have said. That tack is inscrutable. *Carter* was a unanimous decision of this court, albeit decided before any of the current justices were serving on the court. To date, we have not overruled or modified its holdings. Accordingly, pursuant to stare decisis, *Carter* is the law in Kansas, notwithstanding what any subsequent non-binding federal court decisions might have said. Moreover, the majority's reliance on the federal district court decision in *United States v. Pledger*, 887 F. Supp. 1400, 1406-07 (D. Kan. 1995), is particularly curious to me, given that it was filed 5 years *before* our *Carter* opinion. But the point is that, having identified a prior decision as touching on the subject matter before us, it is incumbent on this court to deal with it, *e.g.* follow it, distinguish it, modify it, or overrule it. Disregarding a prior opinion because the current court does not like the precedent is unacceptable to me.

Additionally, the majority suggests that it need not consider *Carter* because it represents a narrow exception and Edgar did not argue for its application. But Edgar's 60-1507 motion clearly challenged his attorney's concession of guilt on the two, non-homicide counts. Moreover, he essentially won in the Court of Appeals to the extent that the case was remanded for an evidentiary hearing. It is *the State* that is seeking review, and the State has not asked us to depart from *Carter*. If we find *Carter* is applicable, we can simply say that the Court of Appeals was correct to reverse and remand, albeit for a different reason. We frequently declare district courts to be correct for the wrong reason. See *State v. Murray*, 285 Kan. 503, 533, 174 P.3d 407 (2008) ("[I]f a trial court reaches the right result, its decision will be upheld even if it provided an incorrect reason or engaged in an improper legal analysis.").

To conclude, I see no logical difference between this case and *Carter*. Both defendants pled not guilty to all charges against them,

and both defense attorneys told the jury their clients were guilty of some of the charges. Both defendants possessed a fundamental right to decide how to plead, which rights their attorneys were not entitled to unilaterally waive. If the majority is going to overrule *Carter*, I would prefer that it candidly say so. But for me, *Carter* is still good law in this State, *i.e.*, we still strive to provide all Kansas defendants with a fair trial. I would reverse and remand for a determination of whether Edgar consented to the guilt-based defense. If not, he is entitled to a new trial.