NOT DESIGNATED FOR PUBLICATION

No. 126,981

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

THEODORE JAMES PURDY,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Jackson District Court; MICHAEL WARD, judge. Oral argument held February 4, 2025. Opinion filed August 1, 2025. Affirmed.

*Jonathan Sternberg* and *Brody Sabor*, of Jonathan Sternberg, Attorney, P.C., of Kansas City, Missouri, for appellant.

*Ethan C. Zipf-Sigler*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before WARNER, C.J., GARDNER and HURST, JJ.

WARNER, C.J.: About seven years ago, a jury found Theodore Purdy guilty of rape and aggravated indecent liberties with a child. Purdy later filed a motion under K.S.A. 60-1507, claiming his attorney had provided constitutionally deficient representation and seeking a new trial. The district court held an evidentiary hearing on Purdy's claims and found some, but not all, of his claims to be persuasive. The court vacated Purdy's conviction for aggravated indecent liberties with a child and granted a new trial on that claim, but it denied Purdy's motion with regard to the rape conviction.

1

Purdy now seeks review of the district court's denial of his K.S.A. 60-1507 motion with regard to the rape conviction. He contends that his attorney provided ineffective assistance of counsel at trial by failing to object to a detective's testimony—testimony that, in Purdy's view, contained inadmissible hearsay and ran afoul of the Confrontation Clause of the United States Constitution. After reviewing the trial record and the parties' arguments, we disagree. And we, like the district court, find that Purdy has not shown the detective's testimony affected the outcome of his trial on his rape conviction. We thus affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In October 2016, the grandfather of a three-year-old child—referred to here under the pseudonym Jane—contacted the Eudora Police Department, alleging that Jane had told him that her stepfather, Purdy, would touch her "'in there'" and would put objects "into her," including "pink and white crayons." Jane's grandfather brought her to the Eudora Police Department, where Jane stated, "'[M]y hoohoo hurts'" and "'[Purdy] puts hair ties and *unintelligible*.'" Because these allegations purportedly occurred in Jackson County, the Eudora Police Department referred the case to the Jackson County Sherriff's Office, where Detective Mark Montague was assigned to the investigation.

Detective Montague contacted Purdy, who voluntarily came to the sheriff's office for an interview. There, Montague advised Purdy of his *Miranda* rights, and when Montague told Purdy about the allegations against him, Purdy denied that anything improper had happened. At Montague's request, Purdy agreed to speak with James Bridges, a special agent at the Kansas Bureau of Investigation, and to submit to a polygraph examination.

2

The same day, Purdy consented to and helped Montague search Purdy's house for a white and a pink crayon. Montague ultimately seized some crayons, but he never submitted them for DNA testing.

A few days later, Purdy met Agent Bridges at the sheriff's office for the polygraph examination. Bridges again advised Purdy of his *Miranda* rights, administered the polygraph examination, and then, at the test's conclusion, continued asking Purdy questions about the allegations against him—a process that lasted over three hours. During Bridges' questioning, Purdy initially denied touching Jane inappropriately. But he eventually admitted that on one occasion he had inserted his middle finger up to the first knuckle into Jane's vagina for between five and six seconds while bathing her but claimed it had been an accident.

Bridges left the room, and Detective Montague entered. Montague asked Purdy to confirm his statement to Bridges—that he had inserted his finger into Jane's vagina. Purdy was then arrested and moved to the jail. Soon after, Montague received a message that Purdy wished to speak with him. Montague went over to the jail, and Purdy told him that "it was not an accident, it was out of curiosity." Montague returned with Purdy to the interview room, where Purdy stated:

> "A month ago, while I was giving [Jane] a bath, I had, out of curiosity, put the tip of my middle finger in her vagina. About five seconds after that, my brain clicked on and I realized that it was wrong. I instantly took my finger out and I made sure she put clothes on and put her to bed. And I made sure after that to never put myself in that situation again um to which where if I happened to be the one to give her a bath, all I did was wash her hair."

Purdy was later charged with one count of rape and one count of aggravated indecent liberties with a child, both off-grid person felonies. Purdy moved to suppress the inculpatory statements he made to law enforcement, arguing they were coerced and

involuntary. The district court denied the motion, finding Purdy had made these statements freely and without undue coercion. The case against Purdy proceeded to trial.

Because Purdy's challenge on appeal centers on the trial testimony of Detective Montague and Agent Bridges, we discuss both men's testimony in detail.

*Agent Bridges' testimony*

Agent Bridges testified that he often assists other law enforcement agencies with investigations when they need "a little bit of extra manpower." Bridges explained his general approach when interviewing suspects: he reviews the suspect's *Miranda* rights, explains to them why he is there, and asks them for their view of the allegations and the surrounding circumstances. Bridges discussed how the Jackson County Sheriff's Office had requested his help in interviewing Purdy and the subsequent three-hour interview.

During Bridges' trial testimony, the State asked him, "Now, this allegation that was made, . . . was it pretty specific as far as what had occurred with this child's genitalia?" Purdy's trial counsel, Jason Belveal, objected, claiming the question called for hearsay. The State countered, arguing that Bridges' answer "goes to the reason for his investigation as well as the reason that he asked Mr. Purdy certain questions." The district court overruled Belveal's objection, and Bridges answered: "The allegation I was made aware of was that Mr. Purdy had put a crayon or crayons into the little girl's vagina. And I asked Mr. Purdy about that. And he said that he had never put anything, crayons or anything else into the little girl's vagina."

Bridges testified that while Purdy initially denied anything had happened, Purdy later admitted to putting his "middle finger up to the first knuckle . . . into the little girl's vagina . . . for between five to six seconds."

4

The State then moved to publish "roughly the last 20 minutes" of the three-hour recording of Purdy's interview. Belveal objected to the video's admission, but the court overruled the objection. The State played about 17 minutes of the video; the record is unclear as to the exact portion shown.

*Detective Montague's testimony*

Later in the trial, Detective Montague testified about the information he learned from the Eudora Police Department regarding the allegations against Purdy. Montague also explained how Purdy had agreed to meet him at the sheriff's office and what they had discussed during that initial interview. He testified that Purdy agreed to help him search Purdy's house and about Purdy's willingness to return to the sheriff's office a few days later to meet with Agent Bridges. During Montague's testimony, the State asked him whether one of the specific details that had been alleged was that Purdy had inserted something into Jane's vagina. Montague answered that it was. The following exchange then took place:

> "Q. Okay. What was your purpose in going out to the house?
> "A. Um, originally there were some allegations of items that may have been inserted into [Jane's] vagina. And so I went out basically to take a look and see if those items were there.
> . . . .
> " Q. Okay. Ultimately, did you collect some crayons from the house?
> "A. I did."

Montague then testified about how, after Purdy admitted to Bridges that he had inserted his finger into Jane's vagina, Montague entered the room and had Purdy confirm that admission. The State then played 15 minutes "of the remaining portion of the video" of Purdy's interview.

Montague also explained how Purdy had requested to speak to him again after Purdy had been taken to the jail, where Purdy told Montague that his actions were "not an accident," but done "out of curiosity." The men then returned to the interview room and Purdy admitted to inserting his finger into Jane' vagina "out of curiosity." The State then played the recording of this statement over Belveal's objection.

After hearing all the evidence, the jury convicted Purdy of rape and aggravated indecent liberties with a child.

*Posttrial proceedings*

Following his convictions, Purdy moved for a new trial. He claimed that the State had violated his Sixth Amendment right to confront the witnesses against him because Bridges and Montague had "alluded to" statements that Jane had made during the investigation even though neither she nor her grandfather had testified at trial. Purdy also claimed that his convictions should be vacated under the "Corpus Delecti Rule" because, absent his confessions to law enforcement, there was "*no evidence whatsoever* that any crime took place."

The court denied Purdy's motion for a new trial, finding that Purdy had received a fair trial. The court also rejected Purdy's corpus-delicti argument, finding that his confessions were trustworthy under the analysis laid out by the Kansas Supreme Court in *State v. Dern*, 303 Kan. 384, 410-11, 362 P.3d 566 (2015). It then ordered Purdy to serve two concurrent hard 25 life sentences.

Purdy appealed his convictions, claiming, among other things, (1) that the district court had erred by denying his pretrial motion to suppress his confessions to law enforcement; (2) that these confessions, by themselves, were insufficient evidence to support his convictions under the corpus-delicti rule; and (3) that the district court had

erred by allowing Agent Bridges to testify about the allegation "'that Mr. Purdy had put a crayon or crayons into the little girl's vagina.'" *State v. Purdy*, No. 119,872, 2020 WL 1897370, at *13 (Kan. App.) (unpublished opinion), *rev. denied* 312 Kan. 899 (2020).

This court affirmed Purdy's convictions. We found that the district court had not erred by denying his pretrial motion to suppress his confessions because, under the totality of the circumstances, these statements had been voluntary and uncoerced. 2020 WL 1897370, at *10. We also rejected Purdy's corpus-delicti argument, finding that his confessions were trustworthy and that they were sufficient to sustain his convictions. 2020 WL 1897370, at *11-12. Finally, we found that Bridges' testimony about the allegations that "'Purdy had put a crayon or crayons into the little girl's vagina'" "cannot be the basis for reversal" since Purdy had failed to object to the same statements during Detective Montague's testimony. 2020 WL 1897370, at *13-14. Thus, we concluded, "[a]ny prejudice caused by Bridges' testimony was cumulative to the prejudice caused by Montague's testimony." 2020 WL 1897370, at *14.

*Purdy's K.S.A. 60-1507 motion*

After his direct appeal concluded, Purdy filed a motion for postconviction relief under K.S.A. 60-1507—the subject of this appeal. In that motion, Purdy argued that his trial attorney, Belveal, had provided constitutionally deficient representation in several ways and that these deficiencies denied him a fair trial. In particular, Purdy argued that Belveal had (1) not advised him of the State's pretrial plea offer; (2) not objected to the admission of hearsay evidence during Detective Montague's testimony and during the recording of Purdy's interview with law enforcement; and (3) not objected to the jury instruction on aggravated indecent liberties with a child (which Purdy claimed contained the wrong culpable mental state).

The district court held an evidentiary hearing on Purdy's motion. There, the court heard testimony from the prosecutor, Purdy, and Belveal. Belveal was questioned at length on his decision not to lodge a hearsay objection during Montague's trial testimony. Belveal explained that he had decided not to object because he believed the objection would have been overruled and so he did not want to be "waving a red flag in front of the jury saying, 'Hey, I don't want you to hear this.'" Belveal did acknowledge that if he would have been granted a continuing objection to hearsay during Agent Bridges' testimony, he would not have had to make this decision during Montague's testimony.

Following the hearing, the district court granted Purdy's motion in part. The district court rejected Purdy's first claim, finding that Belveal had been effective during the pretrial plea-bargaining process. But it agreed with him on the third claim—that Belveal had been ineffective when he failed to object to the jury instruction for the aggravated indecent liberties with a child. The court reversed that conviction and ordered a new trial on that charge.

As for Purdy's second claim, the court found that Belveal's decision to not object during Montague's testimony foreclosed the opportunity to discuss the hearsay objection in Purdy's direct appeal. But the court found that this error did not prejudice Purdy, as any objection to Montague's testimony likely would have been overruled for the same reason that the trial court had overruled the objection to Bridges' testimony. And the court concluded that Belveal's decision not to object to Montague's testimony did not affect the outcome of the trial because Purdy had confessed to law enforcement that he had digitally penetrated Jane in the bathtub.

Purdy moved to amend the court's judgment, urging it to conclusively decide whether Montague's testimony was properly admitted because doing so would clarify whether Belveal's performance had prejudiced Purdy. The court obliged, finding that Montague's testimony "fits squarely within the classic definition of non-hearsay" because

it did not go to the truth of the matter stated but to explain "why [Montague] searched [Purdy's] home." Thus, the court found that if Belveal had objected to Montague's testimony on that basis, it would have been overruled. The court then reiterated its previous finding that Belveal's trial performance had not affected the outcome of Purdy's trial. Purdy appeals.

## DISCUSSION

The task before us is a narrow one. Purdy does not challenge the district court's finding that Belveal had not provided constitutionally deficient representation during pretrial plea negotiations. Nor does the State appeal the district court's grant of a new trial for the charge of aggravated indecent liberties with a child. Thus, the sole issue before us is whether the district court erred when it denied Purdy's second claim—that Belveal provided ineffective assistance of counsel by not objecting to Detective Montague's trial testimony.

The Sixth Amendment to the United States Constitution guarantees criminal defendants the effective assistance of an attorney. See U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 684-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A person asserting the denial of that right must show that their attorney's performance was constitutionally deficient and that this deficiency so tainted the previous proceedings as to deprive them of a fair trial. 466 U.S. at 687; *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985) (adopting the *Strickland* approach in Kansas). Put another way, a person claiming ineffective assistance of counsel must demonstrate (1) constitutionally deficient representation and (2) prejudice. And this prejudice inquiry requires a person to show "'a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.'" *Edgar v. State*, 294 Kan. 828, 838, 283 P.3d 152 (2012).

When determining whether an attorney's representation fell below an objective standard of reasonableness, this court's scrutiny is "highly deferential" to the attorney's strategic choices over the course of the trial. *Khalil-Alsalaami v. State*, 313 Kan. 472, 485, 486 P.3d 1216 (2021). Every effort is made to eliminate the distorting effects of hindsight, reconstruct the circumstances surrounding the challenged conduct, and evaluate the conduct from counsel's perspective at the time. *State v. Evans*, 315 Kan. 211, 218, 506 P.3d 260 (2022). A court considering a claim of ineffective assistance of counsel must presume that defense attorney's conduct fell within the wide range of reasonable professional assistance unless the defendant shows otherwise. *Khalil-Alsalaami*, 313 Kan. at 486.

1. *We are skeptical of Purdy's claim that Belveal provided ineffective representation.*

Purdy asserts Belveal provided ineffective representation when he decided not to object to the State's question as to why Detective Montague originally went with Purdy to search Purdy's house. Purdy argues that any reasonable attorney would have objected to this testimony because Montague's response—that "originally there were some allegations of items that may have been inserted into [Jane's] vagina"—was "plainly" testimonial, and thus barred by the Confrontation Clause without an adequate opportunity for cross-examination, and contained inadmissible hearsay. Purdy also asserts that we are foreclosed from considering whether Belveal's representation was deficient because the district court found that the absence of an objection prevented consideration of Purdy's hearsay claim in his direct appeal, and the State has not challenged that finding.

At best, we are skeptical of these arguments. We agree with the district court's finding that Purdy could not challenge the trial court's hearsay ruling on Agent Bridges' testimony during his previous appeal since Montague had provided an identical explanation without any objection. See K.S.A. 60-404 (requiring a timely and specific objection before the admission of evidence can be challenged on appeal). But the district

10

court did not find that Belveal *should have objected to Montague's testimony on confrontation or hearsay grounds*. Rather, it found the opposite to be the case.

There are at least two instances described in the record when Jane made statements about Purdy inserting items into her vagina. The first occurred while Jane's grandfather was babysitting her; Jane told him that Purdy would touch her "'in there'" and would put objects "into her," including "pink and white crayons." Then, after her grandfather brought her to the Eudora Police Department, Jane said, "'[M]y hoohoo hurts'" and that "'[Purdy] puts hair ties and *unintelligible*.'" The portion of Montague's testimony that Purdy challenges relates only to the statement about "crayons." Thus, we focus only on the statements Jane made to her grandfather.

Although there is no clear definition of what makes a statement "testimonial," the United States Supreme Court has indicated that a statement is likely testimonial if the circumstances "objectively indicate" that the primary purpose of the questioning is to establish past events that would be relevant in a criminal prosecution. *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). Similarly, the Kansas Supreme Court has noted that the inquiry into what constitutes a testimonial statement "'should generally seek to identify statements that are by nature substituting for trial testimony.'" *State v. Carr*, 314 Kan. 615, 677, 502 P.3d 546 (2022).

Both of our reviewing courts have declined to categorically exclude statements made to non-law enforcement or government actors from the class of testimonial statements. See *Ohio v. Clark*, 576 U.S. 237, 246, 135 S. Ct. 2173, 192 L. Ed. 2d 306 (2015); *State v. Williams*, 306 Kan. 175, 198, 392 P.3d 1267 (2017). But both have held that statements made by a young child to an adult that is not charged with uncovering and prosecuting crimes are far less likely to be considered testimonial than statements given to law enforcement officers. *Clark*, 576 U.S. at 247-48; *Williams*, 306 Kan. at 194.

11

Here, there is no evidence that the primary purpose of Jane's statements to her grandfather was to gather evidence for Purdy's prosecution. Instead, it appears that the primary purpose of this informal and spontaneous conversation was to protect Jane and to stop any ongoing abuse. Jane—three years old at the time—likely did not understand the details of the criminal justice system nor intend her statements to be a substitute for her trial testimony. Rather, "a young child in these circumstances would simply want the abuse to end, would want to protect other victims, or would have no discernible purpose at all." *Clark*, 576 U.S. at 248. Thus, we are skeptical that the statements Jane made to her grandfather were testimonial in nature and thus could trigger the procedural protections of the Confrontation Clause.

We are also skeptical that Montague's testimony contained inadmissible hearsay. Hearsay is "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." K.S.A. 2024 Supp. 60-460. This evidence is inadmissible unless it fits within one or more of the statutory exceptions listed in K.S.A. 60-460. But an out-of-court statement is not considered hearsay if it is offered for something other than the truth of the matter stated—like "'to show [the statement's] effect on the listener.'" *State v. Race*, 293 Kan. 69, 76, 259 P.3d 707 (2011); see *State v. Randle*, 311 Kan. 468, 476, 462 P.3d 624 (2020).

The district court found that Montague's testimony "fit[] squarely within the classic definition of non-hearsay" because it was offered to explain why Montague searched Purdy's home, not for the truth of the matter stated. We agree—although the substance of the detective's testimony contained one of the allegations the State sought to prove at trial, it was made in the context of explaining the ongoing investigation and the reason why Montague had gone with Purdy to search Purdy's house.

Thus, we question whether Belveal's representation rose to the level of a constitutional deficiency under *Strickland*.

12

But even if we were to assume that Belveal's representation fell below an objective standard of reasonableness, Purdy has not shown that this representation affected the trial's outcome with regard to the rape conviction—the only conviction now before us. Purdy claims that, had Belveal objected during Montague's testimony, the jury would have acquitted Purdy of rape or, in the alternative, his rape conviction would have been reversed on appeal because his confessions alone were insufficient to support the conviction under the corpus-delicti rule. We find neither argument persuasive.

2. *Purdy has not shown the outcome of his trial would have been different on the rape charge if Belveal had objected during Montague's testimony.*

Purdy's first argument (that a jury would have acquitted him had Belveal objected to Montague's testimony) is conclusory and speculative. It presumes that the trial court would have sustained such an objection—a conclusion we find unlikely for the reasons we have already explained. And even if the jury had been ordered to disregard Montague's explanation for the reason he had gone to search Purdy's house, it was still able to consider similar evidence that had been admitted during Bridges' testimony—over Belveal's objection.

Purdy next asserts that an objection during Montague's testimony would not only have been sustained but also would have led the court to change course and change its ruling on the earlier objection to Bridges' testimony. He offers no reason, beyond speculation, as to why such a change would have occurred. But even if the trial court were to have reversed course in the way Purdy suggests, his challenge fails for another, more fundamental reason: He has not shown why, in the absence of Detective Montague's and Agent Bridges' testimony regarding the original statement that led to their investigation, the outcome of the trial would have been different regarding his rape conviction—a crime based on conduct to which he confessed.

13

Purdy acknowledges that, during his interview with law enforcement, he confessed that he had, "out of curiosity, put the tip of [his] middle finger in [Jane's] vagina" while he had been giving her a bath, and that he realized after about five seconds that his conduct "was wrong." But he claims that this confession was only admitted at trial because it was corroborated by Montague's and Bridges' testimony. He claims that if Belveal had objected to the officers' testimony and the trial court had sustained his objection in the way Purdy now argues in his K.S.A. 60-1507 motion, there would not have been anything to demonstrate that the confession was knowingly or voluntarily given.

This argument is again rooted in speculation and aims to relitigate this court's previous corpus-delicti ruling in Purdy's direct appeal. But perhaps more importantly for purposes of our analysis here, Purdy's argument presumes that if Belveal had objected before Montague could explain why he originally went to search Purdy's house, neither Montague nor Bridges would have been allowed to testify *at all* regarding their investigation. This argument lacks support in the record.

Bridges and Montague testified at length about the circumstances that led to the investigation, Purdy's various interviews, Montague's search of Purdy's home, and Purdy's ultimate confessions. Purdy also testified in his own defense, seeking to explain away his inculpatory statements. Removing Montague's isolated statement would not disturb this other corroborating evidence. Montague's and Bridges' explanations as to how the investigation unfolded and how Purdy eventually confessed to conduct that gave rise to his rape conviction would remain. The State would thus have provided a foundation for playing the segments of the video of Purdy's interview.

Indeed, during his direct appeal, this court concluded that there were several factors that showed Purdy's confession had been given voluntarily. While the court did

14

note that Montague had testified that Jane complained that Purdy had inserted something into her vagina, we also noted:

- Purdy had confessed on multiple occasions to the same conduct—that "while bathing [Jane], [he had] inserted the middle finger of his right hand into her vagina up to the first knuckle and left it there for a few seconds." And he did not change his story, even when he had the opportunity to do so. *Purdy*, 2020 WL 1897370, at *11.

- Purdy showed no outward signs of distress while making these confessions nor did he give any indication that his state of mind was causing him to make a false confession. 2020 WL 1897370, at *12.

- The confession did not include any facts or details that would have been outside his personal knowledge. 2020 WL 1897370, at *12.

- There was nothing about Purdy or his background—"'an adult male with a high school education' who 'made it through Marine boot camp' and 'saw combat as a Marine'" and who was employed as a corrections officer at the time of the interview—that made him "more susceptible to coercion." 2020 WL 1897370, at *9.

- Purdy's interactions with Bridges and Montague "were not unfair overall, they were not excessively long, and they did not include undue pressure or trickery." 2020 WL 1897370, at *12.

Purdy does not challenge these findings, which demonstrate that Montague's testimony was not the only evidence showing Purdy's confession had been voluntarily given. Thus, Purdy has not shown that the jury would not have learned of his confession

if Belveal had objected to Montague's limited statement regarding the reason for his original search.

And after watching the recording of Purdy's confession and considering the other evidence presented at trial, the jury found that the State had proven beyond a reasonable doubt that Purdy had committed rape. Purdy has not convinced us that an additional objection by Belveal would have changed this outcome. That is, he has not shown "'a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.'" *Edgar*, 294 Kan. at 838.

The district court thus properly denied the second claim in Purdy's K.S.A. 60-1507 motion. We affirm that judgment.

Affirmed.