NOT DESIGNATED FOR PUBLICATION

No. 117,218

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DAKOTA R. ANDERSEN,
*Appellant*.


MEMORANDUM OPINION

Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed December 6, 2019. Affirmed.

*Kristen B. Patty*, of Wichita, for appellant.

*Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before MALONE, P.J., STANDRIDGE and WARNER, JJ.


PER CURIAM: Dakota R. Andersen was convicted of aggravated kidnapping, aggravated robbery, aggravated burglary, aggravated battery, felony theft of a firearm, and criminal threat. After Andersen filed a direct appeal with this court, we granted his request to remand the case to the district court for a hearing pursuant to *State v. Van Cleave*, 239 Kan. 117, 716 P.2d 580 (1986), based on allegations made by Andersen that his trial counsel was ineffective. Following an evidentiary hearing, the district court denied Andersen's ineffective assistance of counsel claims. Andersen challenges this ruling on appeal.

1

In the early morning hours of May 4, 2015, City of Hutchinson police officers were dispatched to the scene of a reported aggravated robbery. Officers made contact with 91-year-old Wesley Oakley, who claimed he had been robbed at gunpoint. Oakley's residence was in disarray and his phone had been disabled. Oakley advised that he had been asleep in his bed when he awoke to "strobing lights" and three men inside his house. According to Oakley, the intruders rolled him onto his stomach, placed a gun to the back of his head, and told him not to move. Oakley stayed in that position for 20 to 40 minutes while the men looked for drugs, guns, and money before leaving in Oakley's minivan. After Oakley heard the men exit through the garage, he went to a neighbor's house and asked them to call the police. Oakley reported that along with his minivan, the men stole several firearms, cash, credit cards, war medals, and jewelry belonging to his daughter and his deceased wife. The next day, law enforcement located Oakley's minivan parked in the southeast part of town. A smoking pipe that did not belong to Oakley was discovered on the floor of the minivan.

Shortly before 5 a.m. on May 14, 2015, law enforcement was dispatched to the scene of another aggravated robbery. There, officers spoke with Brent Rump, who advised that he had been woken up by three men who hit him, tied him up, and ransacked his house looking for money, guns, and drugs. Rump did not recognize the men, who were wearing hoodies and bandanas that covered their faces. Rump reported that the men stole several items from him, including guns, TVs, a Jeep Grand Cherokee, a Honda Accord, some electronics, cash, and his Visa debit card. One of the men held a gun to Rump's head and forced him to reveal the card's PIN number. Sometime after the men left, Rump untied himself and went to a neighbor's house to call the police.

At 5:05 that same morning, an individual wearing a white hoodie made multiple attempts to withdraw money from an ATM using Rump's stolen debit card. The

individual ultimately succeeded in withdrawing $200. The transactions were captured on the bank's surveillance video system.

A few hours later, law enforcement located Rump's vehicles parked between two apartment buildings. Detectives decided to conduct surveillance to see if anyone would return for the vehicles. That afternoon, a red Dodge pickup truck pulled up behind Rump's Honda Accord. A black male exited the truck, entered the Accord, and drove away. Law enforcement followed the Accord and attempted to conduct a traffic stop. The driver of the Accord backed up into a police car and sped away. Following a police pursuit, the driver abandoned the Accord in an alley and ran into the back of a residence located on the 300 block of West 6th Avenue. Law enforcement entered the residence and arrested the driver, who was identified as Fredrick Lemons. Law enforcement later obtained a warrant and searched the home.

During a later interview with Lemons, law enforcement learned that earlier that morning, he had been dropped off at a residence located on the 700 block of West 6th Avenue. Further investigation revealed that Andersen lived at that residence with his girlfriend Brittney Larrick. Based on Lemons' connection to the residence, law enforcement applied for and obtained a warrant to search the home for evidence associated with the Rump home invasion. Before obtaining the search warrant, detectives entered the residence to secure animals and/or to conduct a protective sweep for officer safety and to prevent the destruction of evidence. After obtaining the warrant, law enforcement recovered numerous items belonging to both Rump and Oakley. Officers also seized a white hoodie from the kitchen counter. The officers were aware that an individual wearing a white hoodie had used Rump's debit card at the ATM. Officers also searched a car parked outside the residence and discovered a First National Bank ATM receipt of a transaction on Rump's debit card from that morning.

Following the search, law enforcement was unable to locate Andersen. They interviewed Larrick, who advised that she and her two-year-old son lived with Andersen and that she was pregnant with Andersen's child. Larrick told detectives that Andersen had left town for Oklahoma immediately after the search of their residence. Several days later, Larrick drove to Oklahoma and brought Andersen back to Hutchinson. During the drive, Andersen told Larrick he had participated in the Oakley and Rump robberies. Andersen provided details of both incidents and explained that he had committed the crimes because he knew no other way to support their family. Larrick also told detectives that she specifically recalled the morning of May 14, 2015. She said Andersen arrived home around 4:30 or 4:40 that morning after playing video games at a friend's house. Andersen left shortly after coming home, but Larrick later awoke to Andersen and Lemons both sleeping in her bed.

The State charged Andersen with several crimes relating to both the Oakley and Rump home invasions:  two counts each of aggravated robbery and aggravated burglary, and single counts of aggravated kidnapping, aggravated battery, felony theft of a firearm, and criminal threat.

Before trial, Andersen moved to suppress the evidence seized from his residence, alleging that law enforcement had conducted an illegal search by entering the residence before obtaining the search warrant, and in doing so, observed items that were later seized. Following an evidentiary hearing, the district court granted Andersen's motion. Specifically, the court held the officers lacked authority to enter the residence to conduct a safety sweep before obtaining the search warrant.

The State filed a motion asking the district court to reconsider its suppression ruling. In support of the motion, the State alleged that because no information observed from the initial entry into the residence was used to obtain the search warrant, the evidence inevitably would have been discovered during execution of the lawful search

4

warrant. The day before the scheduled jury trial, the district court informed counsel that it intended to grant the State's request for reconsideration and that it would announce its ruling from the bench the following day. Before jury selection, the district court explained its reason for granting the State's motion. Although the court still believed that law enforcement's initial entry into Andersen's residence was illegal, the court found the evidence was admissible under the inevitable discovery doctrine because it would have been discovered after the warrant was issued.

During its case-in-chief, the State presented the evidence seized from Andersen's residence to support its theory that Andersen was involved in both the Oakley and Rump home invasions. Pursuant to a plea agreement with the State, Brendan Jones testified at trial. Jones said he participated in the May 4, 2015 Oakley home invasion with Andersen and Jordan Leffel. Jones testified the three of them were driving around and targeted Oakley's house after noticing that the garage door was open. Jones said they entered the house by using keys from a work bench in the garage. Jones described the robbery in detail and testified that the three men disconnected Oakley's phone and stole his cash, jewelry, guns, war medals, and minivan.

Larrick also testified at trial. She said Andersen admitted to her that he had been involved in the Oakley robbery. Larrick said Andersen might have admitted to participating in the Rump robbery as well, but if he did he did not provide many details about it. Larrick said she remembered Andersen being gone early in the morning of May 14, 2015, and arriving home later with Lemons. Larrick claimed she only spoke to the detectives because they told her that she would lose custody of her children if she did not do so. But Larrick admitted she was truthful when she told law enforcement what she knew about Andersen's involvement in the robberies. Detective Curtis Black, who interviewed Larrick, denied that law enforcement ever threatened her with losing custody of her children.

The State offered into evidence a recorded telephone call between Larrick and Andersen while he was in jail. During the phone call, Andersen denied that he had gone into the victims' houses. Larrick reminded Andersen that he had admitted his involvement in the crimes and that she had told law enforcement what he had said. Andersen responded, "Yeah, well, now I'm going to do a lot of time." The State also offered into evidence a recorded telephone call between Lemons and Andersen. The phone call took place the day after the search of Andersen's house, when Lemons was in jail and Andersen was in Oklahoma. During the conversation, the men discussed the circumstances surrounding Lemons' arrest and the charges Lemons was facing. Lemons told Andersen that law enforcement found them through use of the debit card. They also talked about the search of both men's houses and what law enforcement found during the searches. Andersen told Lemons he left town after seeing police officers in front of his house, and the men laughed about law enforcement not finding anything while searching certain vehicles. Andersen stated that law enforcement had "nothing" on him, and Lemons asked Andersen to make an anonymous call to tell police that Lemons was not involved in the crimes.

The State presented evidence that the smoking pipe recovered from Oakley's minivan contained DNA belonging to Leffel. The State also presented evidence that Lemons was a contributor to a DNA mixture located on the hat found in Rump's Accord and the white hoodie found in Andersen's residence.

Andersen chose not to testify, and the defense did not present any evidence. The State later alleged during closing argument that Andersen, Leffel, and Jones had committed the Oakley home invasion and that Andersen, Leffel, and Lemons had committed the Rump home invasion. In response, defense counsel argued that the State's case against Andersen was based entirely on circumstantial evidence, noting that no DNA evidence connected Andersen to the crimes and asserting that the testimony of Jones and Larrick was not credible.

6

The jury convicted Andersen as charged. Andersen filed a motion for a new trial, alleging that the jury's verdict was contrary to the evidence and that the district court had erred by allowing the State to introduce evidence of items illegally seized from his residence.

Before sentencing, Andersen expressed dissatisfaction with his defense counsel, Donald Snapp, alleging that Snapp had provided ineffective assistance of counsel. Snapp, for his part, denied any conflict existed and expressed his belief that he had represented Andersen to the best of his ability. The district court allowed Snapp to withdraw and appointed new counsel to represent Andersen. The district court subsequently sentenced Andersen to a term of 246 months in prison. The court also ordered Andersen to pay restitution in the amount of $14,080.57, jointly and severally with Leffel and Lemons.

The district court later held a hearing on Andersen's motion for a new trial. Andersen's new attorney asked the court to allow Andersen to amend his motion for a new trial to include a claim of ineffective assistance of counsel. The district court denied the request to amend, holding that the ineffective assistance of counsel claim instead could be addressed on remand from the appellate court or in a K.S.A. 60-1507 proceeding. Following argument on the issues raised in Andersen's motion for a new trial, the district court denied the motion.

The district court allowed Andersen to file an untimely direct appeal with this court pursuant to *State v. Ortiz*, 230 Kan. 733, 735-36, 640 P.2d 1255 (1982). After filing his appeal, Andersen asked this court to remand his case for a hearing pursuant to *Van Cleave*, 239 Kan. 117, in order to make a factual record related to claims of ineffective assistance of counsel. After the State failed to respond, we granted Andersen's request and remanded the case to the district court for a *Van Cleave* hearing to determine whether Andersen was denied his right to effective assistance of counsel.

On remand, the district court heard testimony from Snapp and Andersen. Snapp testified that he met with Andersen in person numerous times prior to trial. Snapp recalled that he had filed a motion to suppress the evidence obtained from the illegal search of Andersen's residence, which was done before the search warrant was issued. Snapp acknowledged that the motion to suppress did not challenge the search warrant itself based on a lack of probable cause because, after examining the search warrant, he believed there was no legal basis to support it. After the district court initially granted the motion to suppress, Snapp was focused on preparing for trial and believed the evidence would be suppressed right up until the start of trial. Snapp did not remember the district court making any statements about potential probable cause issues with the search warrant in the original suppression order. Snapp testified that, in response to the State's motion to reconsider the suppression ruling, he argued that the inevitable discovery doctrine did not apply because the evidence was tainted as a result of the prior illegal search. Snapp agreed that the evidence seized pursuant to the search warrant harmed the defense. But even if the evidence had been suppressed, Snapp believed there was sufficient evidence to support Andersen's convictions, including Jones' testimony and Andersen's phone call with Larrick from jail.

Snapp testified that he spoke to Larrick at least three or four times before trial. He agreed that Larrick's testimony did not help the defense. And Snapp recalled that Larrick felt pressured to speak with law enforcement. But Snapp did not believe law enforcement told Larrick what to say; rather, the officers suggested that if she did not talk to them she would be in danger of losing custody of her children. Snapp testified that he did not consider adding Larrick's claim of law enforcement coercion to the motion to suppress; instead, he cross-examined Larrick on this point.

Andersen testified that he had little contact with Snapp and that Snapp did not show him any of the evidence before trial. Andersen claimed that he wrote the motion to suppress evidence himself and that he had to try to create his own arguments. Andersen

8

believed the outcome of his trial would have been different if he had been given a new attorney but claimed his request for a new attorney had been ignored.

The parties later provided written argument to the district court. Relevant to this appeal, Andersen alleged that Snapp was ineffective in two respects: (1) by failing to argue that the affidavit in support of the search warrant lacked probable cause and (2) by failing to file a motion to suppress Larrick's involuntary statements to law enforcement.

After hearing testimony from the witnesses and considering written argument from counsel, the district court determined Anderson failed to establish he was denied his right to effective assistance of counsel. Although the court held that Snapp was deficient in failing to challenge the lack of probable cause in the affidavit supporting the search warrant, the court concluded that Andersen could not show that the result of the proceeding would have been different absent Snapp's conduct, given Jones' testimony and Andersen's statements to Larrick. The court also held that Snapp's failure to file a motion to suppress Larrick's statements to law enforcement did not constitute deficient performance, noting that Snapp had adequately cross-examined Larrick about her reasons for speaking to the detectives.

ANALYSIS

Andersen argues that the district court erred in denying his claims of ineffective assistance of counsel. In response, the State contends that Snapp's performance resulted from sound trial strategy and was therefore not constitutionally deficient.

Challenges involving claims of ineffective assistance of counsel present mixed questions of fact and law. When the district court holds a full evidentiary hearing, as the district court did in this case, appellate courts review the district court's factual findings to determine whether those findings are supported by substantial competent evidence.

Appellate courts review de novo the district court's legal conclusions regarding whether counsel provided deficient performance. *State v. Butler*, 307 Kan. 831, 853, 416 P.3d 116 (2018).

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish (1) that the performance of defense counsel was deficient under the totality of the circumstances and (2) prejudice, i.e., that there is a reasonable probability the jury would have reached a different result absent counsel's deficient performance. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014) (relying on *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 [1984]).

The benchmark for reviewing an ineffective assistance of counsel claim is whether the attorney's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a fair and just result. *Bledsoe v. State*, 283 Kan. 81, 90, 150 P.3d 868 (2007). Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence before the judge or jury. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). "[A] fair assessment of attorney performance requires that every effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Crowther v. State*, 45 Kan. App. 2d 559, 564, 249 P.3d 1214 (2011).

Andersen argues, as he did below, that Snapp provided ineffective representation by (1) failing to challenge the lack of probable cause in the affidavit supporting the search warrant and (2) failing to file a motion to suppress Larrick's statements to law enforcement. Andersen also asserts that the cumulative effect of these errors resulted in prejudice sufficient to warrant reversal of his convictions and a new trial.

10

1. *Failure to challenge search warrant affidavit*

The district court held that Snapp's failure to challenge the affidavit for lack of probable cause constituted deficient performance. Specifically, the district court found that the affidavit in support of the search warrant was unsupported by probable cause and "so lacking in indicators of probable cause a reasonable law enforcement officer could not have relied on the warrant in good faith." Notwithstanding Snapp's deficient performance, the district court ultimately concluded that Andersen was not deprived of effective assistance of counsel because he failed to establish that he suffered prejudice as a result of the deficient performance. The court supported its conclusion by citing to evidence of Jones' testimony and Andersen's statements to Larrick.

Our Supreme Court has recognized that "[a] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Edgar v. State*, 294 Kan. 828, Syl. ¶ 4, 283 P.3d 152 (2012); see *Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance of counsel claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one."). Here, we need not review the district court's finding that Snapp's performance was deficient for failing to challenge the affidavit because we agree with the district court that Andersen failed to establish that he suffered any prejudice as a result.

To establish prejudice, the defendant must demonstrate a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015). Andersen argues that he was prejudiced by Snapp's failure to challenge the lack of probable cause in the search warrant affidavit. In support of this argument, Andersen asserts there is a reasonable probability that the jury would not have found him guilty of any of the

11

crimes—particularly the offenses involving the Rump home invasion—without the evidence seized from his residence. To that end, Andersen suggests there was no other evidence tying him to the Rump crimes, noting that Jones only testified about the Oakley robbery and that Larrick did not provide any details about the Rump robbery.

Contrary to Andersen's assertions, the evidence in the record demonstrates that there is not a reasonable probability that the outcome of the trial would have been different if the evidence seized from his residence had been suppressed. Notably, the charges against Andersen would not have been dismissed, as the case still went to trial even after the district court initially granted the motion to suppress. Although the court later reversed its ruling and found the evidence seized from Andersen's residence was admissible, the State also presented the following additional evidence of Andersen's involvement in both home invasions.

Detective Black testified that during his interview of Larrick, she said Andersen had admitted his involvement in both the Oakley and Rump home invasions. Larrick provided Black with several details about the Oakley robbery. While Black conceded that Larrick did not give much detail about the Rump robbery, Black testified that she did specifically recall Andersen's whereabouts on May 14, 2015, the date of the Rump home invasion. Larrick said Andersen had been gone the previous night and was still not home at 4:20 that morning. Larrick said that Andersen arrived home between 4:30 and 4:40 a.m. and that he left soon after. When Larrick woke up later, Andersen and Lemons were both asleep in her bed.

In addition, Larrick testified that Andersen had admitted to participating in the Oakley home invasion. Larrick said Andersen might have mentioned the Rump robbery to her, though she claimed he did not go into detail about it. But Larrick did admit that Andersen was not home in the early morning hours of May 14, 2015, and that he later arrived home with Lemons.

Finally, the State introduced into evidence the recordings of Andersen's phone calls with Lemons and Larrick. Andersen and Lemons talked about how law enforcement had found them through use of the debit card, discussed the search of both men's homes, and laughed about police not finding anything while searching certain vehicles. In his phone conversation with Larrick, Andersen denied entering the victims' houses. But Larrick reminded Andersen that he had admitted his involvement in the crimes to her and that she had told law enforcement what he had said. Andersen did not deny making this admission, instead responding, "Yeah, well, now I'm going to do a lot of time."

A conviction of even the gravest offense can be based entirely on circumstantial evidence. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016). Even if Snapp had successfully challenged the search warrant affidavit, the evidence outlined above would have been sufficient to support Andersen's convictions relating to both the Oakley and Rump home invasions. As a result, Snapp's failure to challenge the search warrant affidavit did not result in any prejudice to Andersen.

2. *Failure to file a motion to suppress Larrick's statements*

The district court held that Snapp's failure to file a motion to suppress Larrick's statements to law enforcement did not constitute deficient performance. Andersen disagrees, claiming that Larrick's statements were "likely involuntary" because Larrick was a young, pregnant woman who was threatened with the loss of her children while facing repeated questioning by a trained detective. In rejecting this claim, the district court noted that Snapp had addressed "the issue of concern for [Larrick's] children" through "a more than adequate job" in cross-examining Larrick.

Andersen's claim of deficient performance lacks support in the record. First, it is questionable whether Larrick's statements to law enforcement were actually involuntary. Larrick testified that police came to her house a few times and that she spoke to

detectives at the police station once. Although Larrick claimed that she only spoke with the detectives because they said that she could go to jail and lose custody of her children if she did not talk to them, Larrick said that she was honest with the detectives about Andersen's involvement in the home invasions. And Detective Black denied that Larrick was ever threatened with losing her children if she did not talk to the detectives. Given the conflicting evidence regarding the nature of Larrick's statements to law enforcement, it is unclear whether a motion to suppress her statements would have been successful.

In addition, Snapp made the decision to challenge the credibility of Larrick's statements to law enforcement through cross-examination. Certain decisions relating to the control and direction of a criminal case are ultimately for the accused and others are ultimately for defense counsel:

> "In the conduct of the defense of a criminal case the technical and professional decisions, which require trained professional skill and judgment, must rest with the lawyer. The decisions on what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his [or her] client." *Winter v. State*, 210 Kan. 597, Syl. ¶ 2, 502 P.2d 733 (1972).

Snapp's testimony at the *Van Cleave* hearing demonstrated that he spoke with Larrick several times before trial, that he was aware of Larrick's claim about her statements to law enforcement, and that he ultimately decided to challenge the credibility of her statements through cross-examination rather than filing a motion to suppress. If counsel has made a strategic decision after making a thorough investigation of the law and the facts relevant to the realistically available options, then counsel's decision is virtually unchallengeable. *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013). Substantial competent evidence supported the district court's finding that Snapp adequately challenged the credibility of Larrick's statements to law enforcement through

14

cross-examination, which in turn supported the district court's legal conclusion that Snapp's failure to file a motion to suppress the statements was not constitutionally deficient.

3. *Cumulative error*

Finally, Andersen asserts that he was denied his constitutional right to effective assistance of counsel based on the cumulative effect of Snapp's errors. But there can be no cumulative error when the record fails to support the errors a defendant raises on appeal, and even a single error cannot support reversal under the cumulative error doctrine. *State v. Gonzalez*, 307 Kan. 575, 598, 412 P.3d 968 (2018); *State v. Marshall*, 303 Kan. 438, 451, 362 P.3d 587 (2015). Andersen's claim of cumulative error necessarily fails.

Affirmed.