NOT DESIGNATED FOR PUBLICATION

116,931

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHRISTIAN PETERSON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; MICHAEL GROSKO and AARON T. ROBERTS, judges. Opinion filed August 27, 2021. Conviction affirmed, and sentence vacated in part.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Daniel J. Obermeier*, assistant district attorney, *Jennifer S. Tatum*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., MALONE and HILL, JJ.

ATCHESON, J.: Defendant Christian Peterson has appealed the verdict of a jury sitting in Wyandotte County District Court finding him guilty of aggravated indecent liberties with a child for sexually abusing a 10-year-old girl he had agreed to babysit. Peterson asserts an array of errors infected jury selection, the evidence admitted at trial, and the prosecutor's closing argument. He also contends his trial lawyer was constitutionally ineffective. We find nothing in those claims that deprived Peterson of a fair trial and, therefore, affirm his conviction. See *State v. Walker*, 308 Kan. 409, 426,

1

421 P.3d 700 (2018) (The defendant "was not entitled to a perfect trial, and he received a fair one.").

Peterson also points out the district court improperly imposed lifetime postrelease supervision on him as part of his sentence of life in prison with parole eligibility after serving 25 years. In that respect, Peterson is correct, so we vacate the imposition of postrelease supervision and otherwise affirm the sentence. See *State v. Fraire*, 312 Kan. 786, 797, 481 P.3d 129 (2021) ("vacating postrelease supervision require[s] no further proceedings at the district court level"). We do not discuss this sentencing issue further.

FACTUAL AND PROCEDURAL HISTORY

Given the issues on appeal, we offer an overview of the basic facts and the progression of the case at the outset. We augment this general review with additions tailored to the issues Peterson has raised on appeal.

D.Y. and D.W. were, respectively, father and mother to three children: a daughter S.Y., who is the victim in this case, and her two younger brothers. On a Friday in late May 2015, D.W. was having difficulty finding a sitter for the children that evening so she and D.Y. could go to a graduation party for one of his nieces. Peterson, an acquittance of D.Y., had stopped by that afternoon and offered to take care of the children so the couple could attend the graduation party. They accepted his offer.

The core allegation is this: Shortly after D.Y. and D.W. left for the party, Peterson sat down on the sofa next to S.Y. and ran his hand up her leg and then reached beneath her underwear to touch her vaginal area. Peterson was then 21 years old, and S.Y. was 10 years old. Alarmed and upset, S.Y. retreated to a bedroom and called her maternal grandmother. Peterson followed her, took away the cellphone, and pleaded with S.Y. not to tell what happened and offered her a dollar to keep quiet. S.Y. took the phone back and

2

went to her own bedroom where she again called her grandmother to report what Peterson had done.

S.Y.'s grandmother then called another family member who, in turn, relayed a message to yet another relative at the graduation party. When D.Y. and D.W. arrived at the party, they were told they needed to go home immediately because Peterson had tried to rape S.Y. Upon returning home, they encountered a distraught S.Y. She told them that Peterson had touched her vaginal area—a sexual assault she characterized as an attempt to rape her.

S.Y. serially described what Peterson did to her to her parents, other relatives, law enforcement officers, and in a videotaped interview with a forensic social worker trained to question children reported to be sexual assault victims. S.Y. also underwent a sexual assault examination at a local hospital to document and collect physical evidence. Some details surrounding the incident varied between the witnesses, and some witnesses offered inconsistent recollections in successive accounts of what they knew. Many of those discrepancies were aired in front of the jury during the trial.

For example, Stanley Morgan, D.Y.'s cousin, was at the house with Peterson, but he may (or may not) have left before D.Y. and D.W. went to the party. Nobody, however, suggests he was present when Peterson assaulted S.Y. We return to Morgan in considering Peterson's claim that his trial lawyer represented him ineffectively. Similarly, everyone agrees S.Y.'s brothers were asleep when the assault took place. But there are varying versions of what S.Y. did before she sat down on the sofa. In her own accounts, S.Y. may have told some people Peterson wore only a shirt and was naked from the waist down when he climbed over the back of the sofa to sit next to her. During the trial, she testified he had on underwear.

3

Peterson did not testify during the trial. He called only Shantell Maxwell, who was his girlfriend in May 2015. Her testimony did not help Peterson, and she, too, figures in his ineffective assistance claim.

The jury heard evidence in the case over two days in January 2016 and convicted Peterson of one count of aggravated indecent liberties with a child, an off-grid felony violation of K.S.A. 2014 Supp. 21-5506(b)(3). The jury found Peterson not guilty of a second charge of lewd and lascivious behavior in violation of K.S.A. 2014 Supp. 21-5513(a)(2), criminalizing "exposing a sex organ" in the presence of a nonconsenting person for sexual satisfaction. At a later hearing, the district court denied Peterson's motion for a new trial and sentenced him to life in prison with parole eligibility after serving 25 years. See K.S.A. 2014 Supp. 21-5506(b)(3); K.S.A. 2014 Supp. 21-6627(a)(1)(C). Peterson timely appealed.

LEGAL ANALYSIS

As we have indicated, Peterson has asserted numerous and varied issues challenging his conviction. We take them up sequentially, adding necessary facts as we go.

*Jury Selection*

During the jury selection process, Peterson's trial lawyer asserted what is known as a *Batson* challenge to the prosecutor's use of peremptory challenges to remove five Black persons from the pool of potential jurors. Peterson is also Black. The district court summarily rejected the claim, finding Peterson had failed to make a prima facie showing of discrimination warranting further judicial inquiry. The matter was disposed of in a terse exchange covering less than a page of the trial transcript.

4

When we first examined this case and the *Batson* issue, we were left to extrapolate a great deal from the short, inexact record. We had no direct information on the composition of the jury, how the alternate juror was chosen, and the precise manner in which the lawyers exercised their allotted peremptory strikes. Based on what we had, we concluded Peterson had made a sufficient showing to go forward with a *Batson* claim necessitating additional judicial examination of the circumstances. We, therefore, issued an opinion remanding the case for a full hearing on the *Batson* challenge. See *State v. Peterson*, No. 116,931, 2018 WL 4840468 (Kan. App. 2018) (unpublished opinion), *rev. denied* 309 Kan. 1352 (2019) (*Peterson I*). We retained jurisdiction and did not consider Peterson's other issues.

After the mandate issued in *Peterson I*, the district court appointed a new lawyer to represent Peterson in the *Batson* hearing, since his original trial lawyer had a conflict because of the claim of ineffective assistance of counsel lodged against him. The district court conducted an evidentiary hearing in November 2019 at which the prosecutor in Peterson's trial was the only witness. Through that hearing, the record has been augmented with the prosecutor's notes made before and during the jury selection process, the juror questionnaires, and detailed information about the jury's composition and how the peremptory strikes were exercised. The district court judge conducting the *Batson* hearing on remand did not preside over the Peterson trial. The issue to be decided in the *Batson* hearing was wholly unconnected to the particular charges or evidence against Peterson, so we perceive no problem in that regard. The parties have suggested none.

The district court denied Peterson's *Batson* challenge. And Peterson has renewed his appeal of that point based on the hearing record. In our present review, we presume a reader's familiarity with the detailed discussion in *Peterson I* of the legal principles governing *Batson* claims and the Kansas Supreme Court's more recent enunciation and application of those principles in *State v. Gonzalez*, 311 Kan. 281, 301-04, 460 P.3d 348 (2020). We summarize them here.

When a defendant asserts a *Batson* challenge, the essential question to be answered is whether the State has purposefully exercised peremptory challenges to strike potential jurors because of their race. In *Batson*, the Court recognized twin equal protection rights in the Fourteenth Amendment to the United States Constitution supporting a prohibition on the State's use of racially based peremptory challenges or juror strikes. First, defendants are denied a constitutional equal protection right if the State seeks to try them before juries "from which members of [their] race have been purposefully excluded." *Batson v. Kentucky*, 476 U.S. 79, 85, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). Just as important, however, citizens called for jury duty have a constitutional right to serve if they are otherwise qualified. The State violates that right when a prosecutor eliminates them during the jury selection process because of their race. 476 U.S. at 87. Exclusion of citizens from jury service based on race reflects "a primary example of the evil the Fourteenth Amendment was designed to cure." 476 U.S. at 85; see *Miller-El v. Dretke*, 545 U.S. 231, 237-38, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) (noting the dual equal protection violations attendant to the State's race-based removal of potential jurors during the selection process).

In *Batson* and later cases, the Court has deployed a three-step process to determine if a lawyer has exercised peremptory challenges based on racial animus. The analytical framework draws on the model developed in employment discrimination cases to probe an employer's intent in hiring, firing, promoting, or otherwise making workplace decisions. *Johnson v. California*, 545 U.S. 162, 170-71 & n.7, 125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005). Because purposeful racial discrimination typically is difficult to prove—seldom will the discriminatory actor admit the illicit purpose—the approach imposes shifting burdens of production of circumstantial evidence. *Foster v. Chatman*, 578 U.S. 1023, 136 S. Ct. 1737, 1747, 195 L. Ed. 2d 1 (2016); *Gonzalez*, 311 Kan. at 302-03.

6

Peterson was obligated to make a prima facie showing of impermissible discriminatory intent on the part of the prosecutor. *Miller-El*, 545 U.S. at 239; *Johnson*, 545 U.S. at 168; *State v. McCullough*, 293 Kan. 970, 992, 270 P.3d 1142 (2012). The burden at this first stage is not intended to be onerous. *Johnson*, 545 U.S. at 170. Immediately following jury selection, the district court held Peterson had failed in that burden and denied the challenge. If the defendant makes a preliminary showing of possible discriminatory intent, the prosecutor is then expected to offer race-neutral reasons for the disputed strikes. *Miller-El*, 545 U.S. at 239; *Johnson*, 545 U.S. at 168; *McCullough*, 293 Kan. at 992. Again, the burden at that second stage is slight. *Purkett v. Elem*, 514 U.S. 765, 767-68, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995). Assuming the prosecutor has done so, the district court should move to the third step and examine all relevant evidence bearing on the true intent behind the peremptory strike of the prospective juror. See *Miller-El*, 545 U.S. at 253; *State v. Williams*, 308 Kan. 1320, 1329-30, 429 P.3d 201 (2018). Peterson bore the ultimate burden of persuasion to show by a preponderance of the evidence that the prosecutor removed the prospective jurors because of their race. See *Gonzalez*, 311 Kan. at 303; see also *Crittenden v. Ayers*, 624 F.3d 943, 958 (9th Cir. 2010); *United States v. Martinez*, 621 F.3d 101, 109 (2d Cir. 2010).

The record developed in the full *Batson* hearing on remand shows the prosecutor used 5 of the State's 12 allotted peremptory strikes to remove Blacks from the pool that would make up the jury. Two Blacks remained on the jury that heard the evidence and convicted Peterson. Three other potential jurors already passed for cause were designated as the pool from which one alternate would be selected. Each side had one peremptory challenge. The prosecutor struck a Black, and Peterson struck a Caucasian, leaving a Black as the alternate juror.

In *Peterson I*, based on the abbreviated discussion in the trial record, we misunderstood the racial composition of the jury. We inferred one Black remained as a

juror and a Black had been selected as the alternate juror. 2018 WL 4840468, at *4. As we have explained, there actually were two Black jurors and a Black alternate. We also assumed the State and Peterson alternated each of their 12 peremptory strikes in removing potential jurors from the pool when they really exercised them two at a time. 2018 WL 4840468, at *3.

The State, then, used peremptory challenges to remove six of nine Blacks from the pool of potential jurors both sides had already passed for cause. Although that represents a slight numerical variance from what we inferred in *Peterson I*, we think the pattern of peremptory strikes is sufficient to satisfy the minimal showing required under the first step in the *Batson* framework. The prosecutor struck two-thirds of the Black prospective jurors—more than random selection would suggest. See *Batson*, 476 U.S. at 97 ("[A] 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination."); *Turner v. Marshall*, 63 F.3d 807, 813 (9th Cir. 1995) ("[T]he prosecutor's exclusion of five out of nine available African-American venirepersons removed a sufficient percentage of African-Americans to establish a pattern of discrimination," even when four African-American women remained on the jury.), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999). But see *Crittenden*, 624 F.3d at 955-56 (government's peremptory strike of only Black "relevant consideration" under *Batson* but alone fails to establish prima facie discrimination).

At the remand hearing and on appeal, the State has not challenged the sufficiency of the prima facie showing and, rather, relies on the second and third steps of the *Batson* protocol as demonstrating race-neutral reasons for the strikes and the absence of purposeful discrimination. We, therefore, do not dwell on the initial stage of the *Batson* inquiry. Cf. *United States v. McMath*, 559 F.3d 657, 664 (7th Cir. 2009) (government's presentation of race-neutral reason for juror strikes without objection to prima facie

8

showing of discrimination renders later objection on that basis moot); *United States v. Roebke*, 333 F.3d 911, 913 (8th Cir. 2003) (same).

During the remand hearing, the prosecutor testified that she did not consider the case to have some sort of racial undercurrent to it, since Peterson and S.Y. are Black. The prosecutor said she typically prefers middle-aged jurors who are employed and have children. She also looks for a stable work history. In this case, the prosecutor considered jurors with children to be especially desirable because they would tend to understand how youngsters behave generally and how they recall and explain events.

The prosecutor's first two peremptory strikes were of Caucasian men who were employed but had no children. One of them was 25 years old. The prosecutor next struck a 49-year-old Black woman with lengthy employment and children and an unemployed Black man who had no children. The prosecutor testified she removed the woman despite her background because of her statements during jury selection that she had a nephew who had been wrongly charged with a sex crime and that she didn't think she could be fair. The man fell outside the prosecutor's preferred criteria in all respects.

In the third set of strikes, the prosecutor removed a 67-year-old Black woman who had children but was not employed. The prosecutor testified she was concerned because the woman had a mild seizure disorder that might flare up and necessitate her removal from a deliberating jury and the woman had expressed some unease with sitting in judgment as a juror.

The prosecutor also struck Juror 39, a 20-year-old Black woman who was childless, unmarried, and had been working at a department store for about 18 months. During the *Batson* hearing, the prosecutor was briefly asked about Juror 39, but the strike has become the focal point of Peterson's argument on appeal. In his brief to us, Peterson

points out the prosecutor did not remove Juror 13—a 20-year-old Caucasian woman with no children and a limited employment history.

During the jury selection process, the prosecutor did not individually speak with either Juror 39 or Juror 13. Peterson submits the two jurors were comparable—especially in the traits the prosecutor was looking for—except for their race, so the removal of Juror 39 and the retention of Juror 13 offers strong circumstantial evidence of racial animus or purposeful discrimination. He did not make that comparison or offer that specific argument to the district court during the hearing.

The hearing record fails to support Peterson's conclusion. At the hearing, the prosecutor disclaimed any detailed independent recollection of the jury selection in Peterson's case. But she made contemporaneous trial notes about the potential jurors and used them in exercising the State's peremptory strikes. The prosecutor testified she received the juror questionnaires less than an hour before jury selection began and hastily went through them, jotting notes as she did. As she questioned the potential jurors, she added to those notes.

The prosecutor's contemporaneous trial notes *mistakenly* indicate Juror 39 was unemployed. At the hearing, the prosecutor acknowledged the mistake. But she was not otherwise questioned about it. The prosecutor's notes contain similar errors about a couple of other potential jurors who are not pertinent to Peterson's *Batson* claim. When the prosecutor struck Juror 39, she apparently believed, albeit incorrectly, that the woman offered none of the personal characteristics the prosecutor had identified as desirable, whereas Juror 13 was at least presently employed.

Peterson bears the ultimate burden of proof on his *Batson* claim, and he has offered no evidence the prosecutor's misunderstanding about Juror 39's employment was something other than an honest mistake. In turn, even considering Juror 39 and Juror 13

10

detached from the rest of the jury selection process, those circumstances fail to demonstrate purposeful racial discrimination and, rather, display an unfortunate error of the sort that crops up with some regularity in real-time trial practice. See *State v. Simmons*, 45 Kan. App. 2d 491, 497, 249 P.3d 15 (2011) (recognizing "a trial unfolds without the precise scripting of theater or cinema").

With her next strike, the prosecutor removed an unemployed, unmarried 46-year-old Black male with two children. He fell outside some of the prosecutor's preferred characteristics. The prosecutor paired that strike with one of an employed, married Hispanic man with three children. At the hearing, the prosecutor said she simply didn't have much information about that prospective juror. But the trial transcript shows she declined to elicit any additional information from him during the selection process. Peterson has not cited the dismissal of the Hispanic juror in support of his *Batson* challenge, so we don't consider that strike, either. But see *Hernandez v. New York*, 500 U.S. 352, 355, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) (prosecutor's deliberate exclusion of Hispanics from jury would violate Equal Protection Clause).

The prosecutor exercised the State's remaining four peremptory strikes to remove three Caucasian men, none of whom had children, and a 34-year-old woman who was single, childless, and identified herself as white/Native American. Those prospective jurors fell outside the prosecutor's preferred criteria, and Peterson does not suggest their exclusion supports his *Batson* claim. But see *United States v. Mitchell*, 502 F.3d 931, 957 (9th Cir. 2007) (Native Americans represent "a cognizable group for *Batson* purposes"); see also *United States v. Prince*, 647 P.3d 1257, 1262 (10th Cir. 2011). As we have indicated, the jury included two Black persons. The prosecutor could have used peremptory challenges to remove either or both of them but did not.

The district court found the prosecutor had provided race-neutral reasons for peremptorily striking the Black prospective jurors. We find no error in that determination.

The district court undertook the final step of the *Batson* inquiry and concluded the prosecutor did not act with purposeful racial animus in removing the five Black prospective jurors. The conclusion effectively entails a credibility determination that the prosecutor's stated reasons for striking the prospective jurors were the true reasons rather than a coverup or pretext for racial discrimination. See *Miller-El*, 537 U.S. at 338-40; *Batson*, 476 U.S. at 98 & n.21. As such, we are obligated to accord the district court's ultimate decision great deference. *Miller-El*, 537 U.S. at 339-40; see also *State v. Newman*, 311 Kan. 155, 160, 457 P.3d 923 (2020) (noting deference due district court's credibility determinations generally). We have examined the totality of the circumstances surrounding jury selection in Peterson's trial and find no grounds to reverse the district court's conclusion that the prosecutor did not violate *Batson* by exercising the State's peremptory strikes with purposeful racial animus.

*Cumulative Evidence*

Peterson next complains the district court improperly admitted the videotaped interview of S.Y. as a trial exhibit over his objection that it was cumulative evidence. Although the objection arguably was not precisely contemporaneous with the State's offer of the videotape itself as an exhibit, we do not rest our decision on that narrow point. Without objection during the trial, the State presented relatives of S.Y. and law enforcement officers who testified to her out-of-court description of Peterson's physical contact with her.

S.Y.'s videotaped statement may have been in some ways more immediate for the jurors than her other out-of-court statements—those statements were recounted by other witnesses, whereas S.Y. spoke for herself in the videotape. But the videotaped statement amounted to evidence that substantively was simply repetitive of what had already been admitted without objection. The appellate courts have consistently rejected the argument that the admission of such evidence creates reversible error. See *State v. Sean*, 306 Kan.

963, 987, 399 P.3d 168 (2017) (harmless error in admitting testimony cumulative of other evidence properly received); *State v. Florence*, No. 120,105, 2020 WL 857999, at *5 (Kan. App. 2020) (unpublished opinion). We find that rule suffices to resolve Peterson's point, and we, therefore, see no reversible error in the admission of the videotaped interview during the trial. In addition, however, Peterson has not included the videotape in the appellate record, an omission that undercuts his claim for relief, since we could not readily assess the impact of the evidence if we were so inclined. *State v. Vonachen*, 312 Kan. 451, 460-61, 476 P.3d 774 (2020) (court will not consider point if appellant fails to furnish record sufficient to permit review of claimed error).

On appeal, the State relies on *State v. Kackley*, 32 Kan. App. 2d 927, 935-36, 92 P.3d 1128 (2004), for the rule that in a criminal jury trial, a district court does not exceed its discretion in admitting the repetitive out-of-court statements of a child victim of reported sexual abuse that describe the abuse. The court in *Kackley* recognized and applied that proposition. Peterson contends *Kackley* was wrongly decided. But we need not revisit the holding in *Kackley* to reject Peterson's claim of reversible error.

*Prosecutor's Closing Argument*

Peterson contends the prosecutor made several improper statements in her closing argument to the jury that deprived him of a fair trial. About eight months after Peterson's trial but well before the parties submitted their appellate briefs on this issue, the Kansas Supreme Court revamped its method of analyzing prosecutorial error in closing argument and in other statements made in the jury's presence. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). Both sides have argued the point under *Sherman*, and it supplies the correct governing standard here. *State v. Butler*, 307 Kan. 831, 862-63, 416 P.3d 116 (2018).

13

The *Sherman* analytical model first considers whether an error has occurred and then weighs any prejudice to the defendant resulting from the error. Comments made during closing arguments will be considered error if they fall outside the wide latitude afforded a prosecutor in discussing the evidence and the law. 305 Kan. at 109. This simply transplants the initial step in the pre-*Sherman* process and substitutes the term "error" for "misconduct," eliminating a more pejorative label at least connoting a deliberate violation of the rules even when there might be only an inadvertent mistake. 305 Kan. at 104-07.

If an appellate court finds the challenged argument to be prosecutorial error, it must then consider prejudice measured by the test set out in *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), for a constitutional wrong. The State, as the party benefiting from the error, must demonstrate "'beyond a reasonable doubt'" that the mistake "'did not affect the outcome of the trial'" taking account of the full trial record. 305 Kan. at 109 (quoting *Ward*, 292 Kan. 541, Syl. ¶ 6). That is, the appellate court must determine if the error deprived the defendant of a fair trial—a constitutional protection rooted both in due process and in the right to trial itself. 305 Kan. at 98-99, 109. The prejudice analysis in *Sherman* replaces a multifactor standard that also considered the prosecutor's bad intent or ill will—breaches of professional conduct the court concluded could be more appropriately addressed in ways other than reversing a conviction in the absence of material prejudice. 305 Kan. at 114-15.

Peterson asserts three instances of prosecutorial error in closing argument:

• Peterson says the prosecutor asserted her personal opinion that S.Y. was credible or otherwise impermissibly vouched for S.Y.'s credibility in arguing the State's case to the jury. Lawyers may not offer their personal opinions to jurors about who among the witnesses should be believed or disbelieved. *State v. Peppers*, 294 Kan. 377, 396, 276 P.3d 148 (2012). Conversely, lawyers may outline reasons grounded in the evidence the

14

jurors might choose to credit or discredit certain testimony. In gauging the propriety of a lawyer's jury argument, the reviewing court should not fasten on individual phrases or sentences divorced from their context but, rather, should assess the sense and effect of the message being conveyed. *State v. Naputi*, 293 Kan. 55, 59, 260 P.3d 86 (2011); *State v. Lopez*, No. 120,754, 2020 WL 7636110, at *3 (Kan. App. 2020) (unpublished opinion).

In her closing argument, the prosecutor told the jury:

"[S.Y.] *has no reason to say this if it's not true.* In cases like this, sometimes you have, you know, a little girl and mom's got a new boyfriend or something like that and she doesn't want him in the house. Or there might be a custody battle going on. The child might have something to gain or lose. Maybe this child is in trouble and so they want to deflect attention away. *That's not present in this case.*

"The evidence shows that this little girl has supportive parents. She's in a house with her brother's [*sic*] and sisters. She enjoys it. She's just had a nice birthday party. She likes being around her family. *There is just absolutely no reason for her to say this happened if it didn't."* (Emphases added.)

A short time later, the prosecutor said, "*I just explained to you why [S.Y.] is credible* and all of the evidence that supports her." (Emphasis added.) Peterson takes particular issue with the italicized comments.

Judge Malone and I see those remarks as fair comment on the evidence rather than an expression of personal opinion on witness credibility. The prosecutor outlined some reasons a child might fabricate a claim of sexual abuse and pointed out to the jurors the absence of those circumstances in this case. The jurors, therefore, could conclude S.Y. had no apparent motive to lie, so *they* should find her credible. That's a proper argument. See *Sean*, 306 Kan. at 980 ("[A] prosecutor does not act outside the wide latitude afforded if he or she merely observes that some reasonable inference about witness

15

credibility may be drawn from evidence introduced at trial."); *State v. King*, 288 Kan. 333, 353, 204 P.3d 595 (2009); *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 (2000) ("When a case develops that turns on which of two conflicting stories is true, it may be reasonable to argue, based on evidence, that certain testimony is not believable.").

Judge Hill would find that the thrust of the prosecutor's comments was an impermissible credibility statement effectively vouching for S.Y. All three of us, however, agree that if the remarks overstepped, they did not deprive Peterson of a fair trial. They were not sufficiently corrosive to undermine the jurors' ability to independently evaluate the evidence, including S.Y.'s credibility.

Peterson also contends the prosecutor's statements somehow impermissibly shifted the burden of proof to him. The State, of course, has the obligation to prove criminal defendants guilty beyond a reasonable doubt, and defendants never shoulder a burden to prove their innocence. Peterson seems to suggest the prosecutor's observation regarding the lack of an obvious motive or other reasons for S.Y. to lie implicitly transfers the burden of proof, requiring him to come forward with evidence discrediting her account. We are unpersuaded.

A defendant may attack and undermine the credibility of a State's witness—and, indeed, its entire case—through cross-examination establishing bias, prejudice, or other motives to lie without affirmatively presenting any evidence. *State v. Ross*, 280 Kan. 878, 886, 127 P.3d 249 (2006) ("'"[P]roof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.'"' [quoting *State v. Knighten*, 260 Kan. 47, 54, 917 P.2d 1324 (1996)]); *Lindquist v. Ayerst Laboratories, Inc.*, 227 Kan. 308, 315, 607 P.2d 1339 (1980) ("[E]vidence of bias or prejudice of a witness is relevant and may be shown on cross-examination or in rebuttal or by other witnesses or evidence."); *State v. Scott*, 39 Kan. App. 2d 49, 56, 177 P.3d 972

(2008) ("One of the methods or techniques for attacking the credibility of a witness is to show partiality, including bias, motive, and interest in the outcome."). Although less pertinent here, cross-examination can undermine witnesses by showing they may not have accurately perceived the events about which they are testifying or no longer recall them correctly. *State v. Salas*, No. 103,605, 2011 WL 2637432, at *2 (Kan. App. 2011) (unpublished opinion). In turn, a prosecutor may comment on the lack of evidence suggesting a State's witness to be unworthy of belief—including cross-examination that fails to undermine credibility—without shifting the burden of proof to the defendant. See *State v. Watson*, 313 Kan. 170, Syl. ¶ 2, 484 P.3d 877 (2021) ("A prosecutor does not shift the burden of proof to the defendant by pointing out a lack of evidence to support a defense or to corroborate a defendant's argument regarding deficiencies in the State's case.").

Peterson has not shown the prosecutor's closing argument deprived him of a fair trial through comments on S.Y.'s credibility or by shifting the burden of proof to him.

• Peterson next assails comments the prosecutor made about the lack of biological evidence tying him to any kind of physical contact with S.Y. He says the comments distorted the evidence to his disadvantage. Lawyers may not intentionally mischaracterize the evidence in arguing a case to the jury. *State v. Anderson*, 294 Kan. 450, 463, 276 P.3d 200 (2012).

The State called a lab examiner to testify about why no DNA evidence from Peterson turned up in the physical examination of S.Y. at the hospital shortly after she reported the incident. The examiner testified that typically with physical contact like S.Y. described with Peterson usable DNA cannot be recovered from skin cells. The examiner testified that her common practice in cases like this is not to test for skin cell DNA. So she did not.

17

In closing argument, the prosecutor reminded the jurors that the examiner testified skin cell DNA commonly could not be recovered in cases like this one. But she did not go on to say the examiner made no attempt to find such DNA in *this* case. We see no prosecutorial error here. The prosecutor accurately recounted a portion of the examiner's testimony. A lawyer has no obligation in closing argument to offer a summary of a witness' testimony and may pick portions to highlight or mention at all. The editorial selection, however, may not substantially distort the testimony by omission or by otherwise stringing bits and pieces together out of context to create a demonstrably false impression. The prosecutor did not create a materially misleading argument here. The jury, of course, heard the examiner's testimony and could measure the worth of the argument against the evidence.

&bull; Peterson contends the prosecutor concluded her final argument to the jury with a pitch that both inaccurately described the law and impermissibly vouched for S.Y. We agree the argument implicitly misstated an aspect of the law related to sex crimes, but the error was sufficiently latent that it did not deprive Peterson of a fair trial. Lawyers, of course, cannot misstate the law in their closing arguments. *State v. Tahah*, 302 Kan. 783, 791, 358 P.3d 819 (2015).

The prosecutor closed her rebuttal—the last words the jurors heard from the lawyers—this way:

> "You have enough evidence based on [S.Y.'s] statement, based on other people's statements who were around her, based on the emotion that you can hear in that jury [*sic*] call that you can't feign, especially not as a ten-year-old. Based upon the fact she doesn't exaggerate, I mean if things are really growing and getting out of control and she wants to get him in trouble, why not say he put his finger in her? Why not say something like that, or that he made her put her mouth on his penis, something like that that's going to get him in even more trouble? Why not do that? She doesn't do it because she's telling us exactly what happened in this case. And that's why this defendant is guilty. Thank you."

This coda returns to the idea that S.Y. had no discernible motive to falsely accuse Peterson. If she did, the prosecutor suggests, she would have made up something more reprehensible and severe than what she actually described. To that extent, the argument pairs with the earlier suggestions that nothing in S.Y.'s life would prompt her to fabricate the accusation against Peterson. For the same reasons, we find no reversible error in the argument as a comment on credibility.

The argument, however, does constitute prosecutorial error as a misleading statement of the law. In the argument, the prosecutor represents that an act of digital penetration or fellatio would "get [Peterson] in more trouble" than the sexual contact S.Y. described. The jurors might reasonably infer from the representation that Peterson would face a lesser punishment for the conduct S.Y. attributed to him than for a sex act involving penetration or oral copulation. But that is not the law in Kansas. As we have already said, Peterson committed aggravated indecent liberties with a child, punishable with a presumptive sentence of life in prison. Vaginal penetration of or oral copulation with a female less than 14 years old also carries a life sentence. See K.S.A. 2020 Supp. 21-6627(a)(1)(B) (life sentence for rape of child younger than 14 years of age); K.S.A. 2020 Supp. 21-6627(a)(1)(D) (life sentence for sodomy with child younger than 14 years of age); K.S.A. 2020 Supp. 21-5503(a)(3) (rape includes sexual intercourse with child younger than 14 years of age); K.S.A. 2020 Supp. 21-5501(a) ("sexual intercourse" defined to include "penetration of the female sex organ by a finger"); K.S.A. 2020 Supp. 21-5501(b) ("sodomy" defined to include "oral contact . . . [with] the female genitalia"). The prosecutor backhandedly misled the jurors about the severity of the punishment Peterson faced if convicted, implying it would not be as harsh as for rape or sodomy.

We are, however, persuaded the error had no effect on the jurors' analysis of the evidence and their decision to find Peterson guilty. First, as we have mentioned, the prosecutor did not directly discuss punishment and appears to have inadvertently offered an erroneous suggestion about the severity of the crime while explaining why the

19

circumstances tended to lend credibility to S.Y. To the extent the jurors picked up on the suggestion at all, we expect they gave it little weight, in part, because it was wholly submerged in an extended set of arguments. In addition, and perhaps more importantly, the district court instructed the jurors consistent with PIK Crim. 4th 50.080 (2015 Supp.) that they should concern themselves only with finding Peterson guilty or not guilty and any further actions were for the court. Appellate courts presume that jurors follow the instructions they are given. *State v. Mattox*, 305 Kan. 1015, 1027, 390 P.3d 514 (2017). We have no tangible reason to depart from that presumption here.

In sum, we find no reversible error in the prosecutor's closing argument to the jury.

*Trial Lawyer's Representation*

Peterson asked the district court to grant him a new trial because the lawyer handling his defense had performed so poorly the representation deprived him of his right to the effective assistance of counsel as guaranteed in the Sixth Amendment to the United States Constitution. Typically, constitutional claims of ineffective assistance are raised in habeas corpus proceedings under K.S.A. 60-1507 after the direct criminal case has concluded. *State v. Herndon*, 52 Kan. App. 2d 857, 868, 379 P.3d 403 (2016). Considering those claims in conjunction with a new trial request necessitates an expanded evidentiary hearing and new counsel for the defendant—building marked delays into the resolution of the direct criminal case. See *Rowland v. State*, 289 Kan. 1076, 1083-84, 219 P.3d 1212 (2009) (Claims based on counsel's ineffectiveness and, thus, his or her trial strategies are seldom amenable to review on direct appeal because there has been "no chance to develop facts and present evidence in support of or in derogation of the quality of the trial representation."); *Brown v. State*, No. 119,063, 2018 WL 6715411, at *8 n.1 (Kan. App. 2018) (unpublished opinion) (Atcheson, J., concurring) (outlining ramifications of considering ineffectiveness claim in conjunction with new trial request). Moreover, if a criminal defendant can otherwise show that he or she should get a new

20

trial, there is no reason to address a constitutional ineffectiveness claim. See *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445-46, 108 S. Ct. 1319, 99 L. Ed. 2d 534 (1988) (Courts should "avoid reaching constitutional questions in advance of the necessity of deciding them."); *State v. Wetrich*, 307 Kan. 552, 558-59, 412 P.3d 984 (2018).

To accommodate the ineffective assistance claim here, the district court appointed a new lawyer to represent Peterson and held an evidentiary hearing at which both Peterson and his trial lawyer testified. The district court found Peterson received constitutionally adequate representation leading up to and during the trial and, therefore, denied his request for a new trial. On appeal, Peterson has narrowed the grounds on which he contends his trial lawyer performed inadequately and submits the district court came to the wrong conclusion on them.

We use the test for constitutionally inadequate legal representation developed in *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and since applied in the Kansas courts. *State v. Phillips*, 312 Kan. 643, 676, 479 P.3d 176 (2021); *Chamberlain v. State*, 236 Kan. 650, Syl. ¶¶ 3, 4, 694 P.2d 468 (1985). To prevail under *Strickland*, a defendant must show both that his or her legal representation "fell below an objective standard of reasonableness" guaranteed by the right to counsel in the Sixth Amendment to the United States Constitution and that absent the substandard lawyering there is "a reasonable probability" the outcome in the criminal case would have been different. 466 U.S. at 687-88, 694. Reasonable representation demands that degree of "skill and knowledge as will render the trial a reliable adversarial testing process." See *Strickland*, 466 U.S. at 688. A reasonable probability of a different outcome "undermine[s] confidence" in the result and marks the criminal proceeding as fundamentally unfair. See *Strickland*, 466 U.S. at 694. The defendant, then, must prove both constitutionally inadequate representation and sufficient prejudice attributable to that representation to materially question the resulting convictions.

21

As the United States Supreme Court and the Kansas Supreme Court have stressed, review of the representation should be deferential and hindsight criticism tempered lest the evaluation of a lawyer's performance be unduly colored by lack of success notwithstanding demonstrable competence. See *Strickland*, 466 U.S. at 689-90; *Holmes v. State*, 292 Kan. 271, 275, 252 P.3d 573 (2011). Rarely should a lawyer's representation be considered substandard when he or she investigates the client's circumstances and then makes a deliberate strategic choice among arguably suitable options. *Strickland*, 466 U.S. at 690-91. Whether a lawyer has made reasoned strategic decisions bears on the competence component of the *Strickland* test.

Regardless of the inadequacy of legal representation, the constitutional claim fails if the defendant cannot establish substantial prejudice. And the district court properly may deny a claim that falters on the prejudice component of the *Strickland* test without assessing the sufficiency of the representation. *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."); see *Edgar v. State*, 294 Kan. 828, 843-44, 283 P.3d 152 (2012); *Oliver v. State*, No. 106,532, 2013 WL 2395273, at *5 (Kan. App. 2013) (unpublished opinion). In other words, even assuming a criminal defendant's legal representation fell below the Sixth Amendment standard, he or she is not entitled to relief if the result would have been no different with competent counsel.

In general, the courts look at a lawyer's overall performance in representing a defendant in determining whether the Sixth Amendment right to counsel has been satisfied, meaning that a minor mistake or even a number of minor mistakes do not breach that duty. See *Harrington v. Richter*, 562 U.S. 86, 110-111, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011); *Kimmelman v. Morrison*, 477 U.S. 365, 386, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986); *Bland v. Hardy*, 672 F.3d 445, 450 (7th Cir. 2012) ("[T]he question under *Strickland* is not whether the lawyer made a mistake, even a serious one; it is

whether the lawyer's *overall* performance was professionally competent."). But a single error causing sufficiently substantial legal prejudice to the defendant to call into question an adverse outcome at trial or on appeal will suffice. See *Miller v. State*, 298 Kan. 921, 938-39, 318 P.3d 155 (2014).

With those principles in mind, we turn to the points Peterson raises on appeal. When we review the denial of an ineffective assistance claim after a full evidentiary hearing, we accept the district court's findings of fact to the extent they are supported with substantial competent evidence. But we exercise unlimited review of the determinative legal issues. *Bellamy v. State*, 285 Kan. 346, 355, 172 P.3d 10 (2007). Some of Peterson's appellate arguments may be described as compact, so we are left to sketch legal and factual details that probably should have been more explicitly provided for our benefit.

• Peterson says he told his trial lawyer about a conversation he had with D.W. in front of S.Y. the day of the incident. According to Peterson, D.W. tearfully recounted how she had been sexually molested as a child and was then disbelieved when she reported what happened. Peterson suggests there were similarities between that incident and what S.Y. says he did to her. Peterson's trial lawyer testified he did not question D.W. about the statement during the trial because he thought it was irrelevant, immaterial, and likely objectionable. That seems to reflect a strategic determination against attempting to go into the purported conversation in front of the jury.

Even assuming the trial lawyer's decision fell below the standard of reasonable representation, we fail to see how Peterson's defense was materially prejudiced. Peterson apparently would have us (and the jurors) believe S.Y. decided to falsely accuse him of sexual abuse because her mother had been disbelieved years earlier. First, of course, we have no evidence that D.W. would have corroborated Peterson's premise that such a conversation ever occurred. Second, Peterson's proposition lacks any logical anchor.

23

Peterson had nothing to do with D.W.'s unfortunate experience, so a false accusation against him by S.Y. would not in some way right that wrong. Moreover, as D.W. supposedly recounted her abuse, S.Y. presumably would have concluded she might not be believed if she were also abused and reported it. That would seem to be a strong disincentive for S.Y. to report Peterson's conduct. Finally, the very assertion such a conversation took place at all strains credulity: Why would D.W. more or less randomly dredge up a remarkably traumatic event from her past and share it with a comparative stranger and do so in the presence of her 10-year-old daughter no less?

The trial evidence also cuts against S.Y. having fabricated her accusation against Peterson. She was emotionally distraught both when she telephoned her grandmother to explain what happened and a short time later when she told her parents. In addition, Peterson had fled—an otherwise inexplicable dereliction of his duties as the sitter for three young children. See *State v. Paulson*, No. 108,795, 2015 WL 6444314, at *20 (Kan. App. 2015) (In some circumstances, flight may be indicative of consciousness of guilt.).

Peterson has not shown his trial lawyer's decision against bringing up D.W.'s purported conversation with him about her own sexual abuse deprived the jury of evidence that would have called into question, let alone changed, its guilty verdict.

• Peterson faults his trial lawyer for calling Maxwell as the only defense witness. As we explained, Maxwell was Peterson's girlfriend in May 2015; she was also a cousin of S.Y. Maxwell recounted conversations she had with family members who had already testified to what S.Y. had told them about the incident with Peterson. Maxwell's testimony essentially amounted to another secondhand iteration of S.Y.'s account. From the hearing record, we infer Peterson's lawyer anticipated Maxwell would tell the jury that at least some family members had said they disbelieved S.Y. She testified to nothing of the sort—something we suppose the trial lawyer should have known before he called Maxwell as a witness. Although Maxwell didn't advance Peterson's defense, she didn't

24

sink the case for him, either. Had she not testified at trial, the body of evidence would have been substantially the same, and the jury would have come to the same conclusion.

At the new trial hearing, Peterson also testified that his trial lawyer told him Maxwell would present a complete defense to the jury, so he did not need to testify in his own defense. At the hearing, the trial lawyer denied making such a representation to Peterson. The district court credited the trial lawyer's testimony, disposing of that aspect of Peterson's claim. In any event, Peterson could have chosen to testify after hearing Maxwell's testimony and didn't.

• As an independent complaint about his trial lawyer's representation, Peterson says he failed to investigate what family members would have said about S.Y.'s accusation against him and failed to subpoena relevant telephone records. The first aspect of this claim seems to link up with what Peterson expected Maxwell to tell the jury: Some relatives of S.Y. either doubted her accusation specifically or believed she was not a truthful person generally. Presumably on Peterson's theory, the telephone records would call into question S.Y.'s account of her conversations with her grandmother or, perhaps, the calls among the family members that night.

Both claims, however, suffered from a fundamental and fatal flaw. Peterson did not call any family members as witnesses at the hearing to testify to S.Y.'s purported lack of credibility. And he produced none of the telephone records as an exhibit at the hearing. In short, he did not establish any such exculpatory evidence even existed. Under the *Strickland* test, Peterson's trial lawyer cannot be faulted for failing to develop or present phantom evidence. See *State v. Sharkey*, No. 113,724, 2018 WL 2376649, at *6 (Kan. App. 2018) (unpublished opinion) (Under *Strickland*, "[s]peculation is generally insufficient to meet the burden of proof to establish prejudice."); *State v. Morgan*, No. 109,099, 2014 WL 5609935, at *8 (Kan. App. 2014) (unpublished opinion) (same).

25

• Peterson faults his trial lawyer for not calling Morgan as a witness at trial. But he fails to show how Morgan's testimony would have been of any assistance to him. First, of course, everyone agrees Morgan had left the house before the sexual assault S.Y. described. So how what he may have known would have advanced a defense for Peterson is less than obvious. The trial lawyer testified he could not find Morgan before the trial to subpoena him or otherwise get him to court.

More to the point here, the lawyer representing Peterson at the hearing did not call Morgan as a witness. Neither the district court nor we have any idea what Morgan would have said about Peterson, S.Y., or their interaction. To suggest he would have aided the defense is no more than speculation. And, as we have pointed out, speculation does not satisfy the *Strickland* test for prejudice.

• Peterson faults his trial lawyer for not cross-examining D.Y. about a debt he supposedly owed Peterson. At the hearing, the trial lawyer testified he thought the matter was irrelevant. On appeal, Peterson does not favor us with a detailed explanation about how the financial obligation, assuming it existed at all, would have afforded him a defense. We suppose it might serve to impeach D.Y.'s testimony describing what S.Y. told him Peterson did to her—the theory being the debt created some prejudice on D.Y.'s part against Peterson. But that doesn't get Peterson very far, since S.Y. testified to the sexual abuse and other relatives recounted her out-of-court descriptions of the incident. Alternatively, Peterson could argue D.Y. enlisted S.Y. to make a false accusation against him to avoid having to pay the debt. Although that theory more directly promotes a full defense of Peterson, it is also considerably more farfetched. The premise of a false accusation is difficult to reconcile with the surrounding circumstantial evidence, as we have already explained. Peterson can show no prejudice flowing from this argument.

In summary, then, Peterson's constitutional challenge to the adequacy of his legal representation up to and during trial presents no demonstrable prejudice calling into

26

question the jury's guilty verdict. The failings Peterson describes neither singularly nor collectively establish prejudice under *Strickland*.

*Cumulative Error*

Finally, Peterson contends the cumulative effect of the errors he has asserted deprived him of a fair trial. Appellate courts will weigh the collective impact of trial errors and may grant relief if the overall impact of the imperfections deprived the defendant of a fair hearing even when the errors considered individually would not necessarily require reversal of a conviction. *State v. Harris*, 310 Kan. 1026, 1041, 453 P.3d 1172 (2019); *State v. Smith-Parker*, 301 Kan. 132, 167-68, 340 P.3d 485 (2014). An appellate court examines the entire trial record to assess the aggregate effect of multiple trial errors. 301 Kan. at 167-68. The assessment takes account of "how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence." *State v. Miller*, 308 Kan. 1119, 1176, 427 P.3d 907 (2018).

Peterson identifies the ineffectiveness of his trial counsel as an error to be weighed in a cumulative error analysis but offers neither case authority nor jurisprudential reasons for doing so. We may decline an invitation that doesn't provide the time, date, or place of the party. *State v. Pewenofkit*, 307 Kan. 730, Syl. ¶ 2, 415 P.3d 398 (2018) (appellate court need not consider point unsupported by authority or by reasoned argument for its validity despite absence of supporting authority). We do so here.

Moreover, we presume without formally deciding that we should not consider the components of Peterson's ineffective assistance claim to be among the ostensible errors we look at in assessing any cumulative degradation of the trial. If a trial lawyer's performance falls below the constitutional standard for legal representation and materially compromises the fairness of the trial, the defendant would be entitled to relief

for that reason. We have found no constitutional deprivation here. But a defense lawyer's individual mistakes, if any, would not be considered in a cumulative error analysis. See *Harris*, 310 Kan. at 1041-42 (court separately considers defendant's claims of cumulative error and of ineffective assistance of counsel). A claim of cumulative error considers the aggregate impact of mistakes by the State and the district court. In other words, a defense lawyer's mistakes should not be considered independently of an ineffective assistance claim.

That said, two members of the panel would find a lone error in the prosecutor's closing argument. Accordingly, there would be nothing to aggregate for purposes of cumulative error. *State v. George*, 311 Kan. 693, 709-10, 466 P.3d 469 (2020). Even assuming dual errors in the prosecutor's argument, they were at best nominal mistakes.

The case ultimately turned on S.Y.'s credibility and the jurors' assessment of her courtroom testimony and her out-of-court statements, along with the circumstances immediately attendant to her accusation against Peterson. The prosecutor's comments we have questioned would have had no more than a negligible impact on those determinations the jurors made during their deliberations. Taken together, those aspects of the closing argument do not persuade us Peterson received less than a fair trial.

Conviction affirmed and sentence vacated in part.